STATE of Wisconsin, Plaintiff-Respondent,

v.

David G. STEVENS, Defendant-Appellant-Petitioner.

Supreme Court

*No. 83–2098–CR. Argued January 3, 1985.—Decided April 30, 1985.*

(Also reported in 367 N.W.2d 788.)

304

For the defendant-appellant-petitioner there were briefs and oral argument by *Margaret A. Maroney*, first assistant state public defender.

For the plaintiff-respondent the cause was argued by *Thomas J. Balistreri,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

DAY, J. This is a review of a published decision of the court of appeals, *State v. Stevens,* 120 Wis. 2d 334, 354 N.W.2d 762 (Ct. App. 1984) affirming in part and reversing in part a judgment of the circuit court for Milwaukee county, Honorable Ralph Adam Fine, circuit judge, convicting the defendant, David G. Stevens, of the following crimes: Possession of cocaine with intent to deliver,[1] party to the crime;[2] possession of

[1] Section 161.16, Stats. 1979–80:

"**161.16. Schedule II.** (1) The controlled substances listed in this section are included in schedule II. . . .

"(4) Coca leaves and any salt, compound, derivative or preparation of coca leaves, and any salt, compound, derivative or preparation thereof which is chemically equivalent or identical with any of these substances, but not including decocainized coca leaves or extractions which do not contain cocaine or ecgonine."

Section 161.41(1m)(b), Stats. 1979–80:

"**161.41. Prohibited acts A—penalties.** (1m) Except as authorized by this chapter, it is unlawful for any person to possess, with intent to manufacture or deliver, a controlled substance. Intent under this subsection may be demonstrated by, without limitation because of enumeration, evidence of the quantity and monetary value of the substances possessed, the possession of manufacturing implements or paraphernalia, and the activities or statements of the person in possession of the controlled substance prior to and after the alleged violation. Any person who violates the subsection with respect to: . . .

"(b) Any other controlled substance classified in schedule I, II or III, may be fined not more than $15,000 or imprisoned not more than 5 years or both; . . ."

[2] Section 939.05, Stats. 1979–80:

"**939.05. Parties to crime.** (1) Whoever is concerned in the commission of a crime is a principal and may be charged with and convicted of the commission of the crime although he did not directly commit it and although the person who directly com-

marijuana with intent to deliver;[3] party to the crime; possession of cocaine;[4] and possession of marijuana.[5] The issues on review are:

1. Was the Defendant's right to be protected from unreasonable searches and seizures under the fourth and fourteenth amendments to the United States

mitted it has not been convicted or has been convicted of some other degree of the crime or of some other crime based on the same act."

[3] "161.14  Schedule I.  (1) The controlled substances listed in this section are included in schedule I. . . .

"(4) Any material, compound, mixture or preparation which contains any quantity of the following hallucinogenic substances, their salts, isomers and salts of isomers, unless specifically excepted, whenever the existence of these salts, isomers and salts of isomers is possible within the specific chemical designation: . . .

"(k) Marijuana; . . ."

"161.41.  Prohibited acts A—penalties. . . . (1m)  Except as authorized by this chapter, it is unlawful for any person to possess, with intent to manufacture or deliver, a controlled substance. Intent under this subsection may be demonstrated by, without limitation because of enumeration, evidence of the quantity and monetary value of the substances possessed, the possession of manufacturing implements or paraphernalia, and the activities or statements of the person in possession of the controlled substance prior to and after the alleged violation. Any person who violates the subsection with respect to: . . .

"(b) Any other controlled substance classified in schedule I, II or III, may be fined not more than $15,000 or imprisoned not more than 5 years or both."

[4] "161.41  Prohibited acts A—penalties. . . . (3)  It is unlawful for any person to possess a controlled substance, other than a controlled substance classified in schedule I or II which is a narcotic drug, unless the substance was obtained directly from, or pursuant to a valid prescription or order of, a practitioner while acting in the course of his professional practice, or except as otherwise authorized by this chapter. Any person who violates the subsection is guilty of a misdemeanor, punishable under s. 939.61."

[5] See Footnote 4.

Constitution[6] and under Article I, sec. 11, of the Wisconsin Constitution,[7] violated by the warrantless search and seizure of garbage which he allowed to be taken from his garage by the regular collector who was acting pursuant to a deputy sheriff's request to obtain the Defendant's garbage?

2. Did the Defendant's multiple convictions subject him to double jeopardy in violation of Article I, sec. 8(1)[8] of the Wisconsin Constitution or violate the

[6] United States Constitution, Amendment Four:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

United States Constitution, Amendment Fourteen, sec. 1:

"All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

[7] Wisconsin Constitution, Article I, sec. 11:

"**Searches and seizures:** SECTION 11. The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized."

[8] Wisconsin Constitution, Article I, sec. 8:

"**Prosecutions; double jeopardy; self-incrimination; bail; habeas corpus.** SECTION 8. [As amended Nov. 1870 and April 1981] (1) No person may be held to answer for a criminal offense without due proces of law, and no person for the same offense may be put twice in jeopardy of punishment, nor may be compelled in any criminal case to be a witness against hlmself or herself."

provisions of sec. 939.66, Stats. 1981–1982[9] or sec. 939.71?[10]

We hold that the search and seizure of the defendant's garbage, (the terms "garbage" and "trash" are used interchangeably in this opinion)[11] under the facts of this case, did not violate his rights under the United States or Wisconsin Constitutions. We also hold that the defendant's multiple convictions did not violate Wisconsin's constitutional or statutory law. Therefore, we affirm in part and reverse in part the decision of the court of appeals.

The defendant, after being charged with the four offenses, entered a guilty plea to the crimes of possession of cocaine and possession of marijuana and was convicted. He was tried on the more serious offenses of possession with intent to deliver cocaine and possession with intent to deliver marijuana. On appeal the court of appeals struck down the convictions of mere possession but affirmed the conviction of possession with intent to deliver cocaine and marijuana. The defendant's petition to this court for review was granted. This court

---

[9] Section 939.66, Stats. 1981–82:

"939.66. **Conviction of included crime permitted.** Upon prosecution for a crime, the actor may be convicted of either the crime charged or an included crime, but not both. . . ."

[10] Section 939.71, Stats. 1981–82:

939.71. **Limitation on the number of convictions.** If an act forms the basis for a crime punishable under more than one statutory provision of this state or under a statutory provision of this state and the laws of another jurisdiction, a conviction or acquittal on the merits under one provision bars a subsequent prosecution under the other provision unless each provision requires proof of a fact for conviction which the other does not require."

[11] *Webster's Ninth New Collegiate Dictionary*, 505 (1983), defines garbage as follows: "garbage. . .1. a: food waste: REFUSE b: unwanted or useless material 2: TRASH. . ."

granted review to determine whether the search of bags of garbage in trash belonging to the defendant was proper, because it was such search that brought forth the evidence on which a search warrant was issued authorizing the search of defendant's home. It was the cocaine and marijuana in the home that led to the charges of possession with intent to deliver. It was this evidence that prompted the arrest of the defendant when he returned to his home and resulted in the additional charges of possession based on evidence found in a shoulder bag, belonging to defendant. The facts giving rise to the charges are as follows.

Deputy Sheriff David Iushewitz of the Drug Enforcement Unit of the Milwaukee County Sheriff's office was in charge of an investigation concerning alleged drug dealing activities of the defendant at his residence in River Hills, Milwaukee county. Deputy Iushewitz was informed by the Department of Public Works for River Hills that garbage at the defendant's residence was normally picked up every second Friday morning at about 9:00 a.m. and the next scheduled pickup was December 14, 1979.

On December 14, 1979, Iushewitz met with the garbage collector employed by the Department of Public Works and told him to go about his normal routine of picking up the garbage at the defendant's house. After he picked up the defendant's garbage, he was to turn it over to Iushewitz.

The usual procedure was that the defendant put bags of garbage in cans outside of his garage and in the driveway for collection. The garbage collector for the Department of Public Works would come up the driveway and collect the garbage. The garage door was not normally left open and the garbage collector did not have general access to the garage.

On December 14th, the garbage had not been placed outside the garage for collection and the garage door was

locked. The garbage collector went to the door of the defendant's house, knocked or rang the doorbell, the defendant opened the door and the collector asked if he could get the garbage. The defendant then opened the garage door, allowing the garbage collector access to the garbage. The defendant testified that he opened the garage door so the collector could do "what he wanted to do."

The garbage collector picked up four plastic garbage bags and loaded them into the truck. After leaving the defendant's property, the collector gave the defendant's garbage to Iushewitz who searched the bags.

The same procedure was repeated on December 28, 1979, the next regularly scheduled pick up. Once again the garbage collector went to the defendant's door and asked for the garbage and the defendant opened the garage door. After obtaining the garbage and leaving the defendant's property, the collector again turned the defendant's garbage over to Iushewitz.

Later that same day, December 28, 1979, a circuit judge issued a search warrant for the search of the defendant's River Hills residence based in part on the evidence turned up in the garbage bags. On December 29, 1979, when the defendant was not home, his house was searched. This search resulted in the seizure of cocaine, marijuana, drug paraphernalia, money and other miscellaneous objects.

Iushewitz had information that the defendant, who had been on vacation for "a couple of days," would be returning home on December 30, 1979. When the defendant did return home on that day, the deputies arrested him on the driveway outside his home.

The defendant was advised that he would be taken downtown for booking and that it might take some time before he could make bail. Deputy Iushewitz testified as follows:

"I told him [the defendant] this was a felony charge, he should probably figure on spending a while in jail because there was no mild bail and I asked if there was anything that he wanted to bring with him down to the jail. He indicated 'in my car,' and pointed to a bag, a brown leather shoulder type bag."

This bag was found in the automobile in which the defendant had just returned from his vacation. When the defendant arrived at the station, his bag was subjected to an inventory search. Approximately two grams of marijuana and approximately one gram of cocaine were found.

The defendant was charged on four different counts. Count one was possession of cocaine with intent to deliver, party to the crime. Count two was possession of marijuana with intent to deliver, party to the crime. Count three was possession of cocaine. Count four was possession of marijuana. Counts one and two were based upon the discovery of the marijuana and cocaine in the defendant's home on December 29, 1979. Counts three and four were based upon the discovery of cocaine and marijuana in the defendant's shoulder bag on December 30, 1979.

The defendant moved to suppress the evidence seized from his garbage and the evidence seized from his home pursuant to the warrant which was issued based, in part, upon the items discovered in the garbage. The defendant claimed that the warrantless search of his garbage was unlawful and, therefore, the issuance of the warrant was also improper. The trial court denied the motion holding that the defendant did not have a reasonable expectation of privacy in his garbage.

On September 14, 1981, the defendant entered a guilty plea to the simple possession charges. The assistant district attorney did not object to the plea as long as it was understood that the events of December 30, 1979, and not the prior discovery of drugs in the defendant's

home on December 29, 1979, formed the factual basis for the plea. The trial court accepted the plea, withholding sentencing until resolution of the charges of possession with intent to deliver.

The defendant then moved to dismiss the charges of possession with intent to deliver. He argued that jeopardy attached after he pled guilty to the charges of simple possession, that these charges were lesser-included offenses of the charges of possession with intent to deliver, and the prosecution for possession with intent to deliver after the guilty plea would violate his double jeopardy rights. In support of this motion, the defendant filed an affidavit in which he said that the marijuana and cocaine which he possessed in his shoulder bag were from the same supplies of marijuana and cocaine seized from his home on December 29, 1979. This motion was also denied.

On May 6, 1982, a jury returned guilty verdicts on both counts of possession with intent to deliver. On July 6, 1982, the defendant was sentenced.[12]

On July 24, 1984, the court of appeals filed its decision in which it affirmed in part and reversed in part the judgment of the trial court. This court accepted review to determine whether the defendant's garbage was unlawfully searched and seized and to determine if the defendant's double jeopardy rights under Wisconsin's constitutional and statutory law were violated.

Because the historical facts of this case are not in dispute and because the dispute concerns the constitutional and statutory significance of those facts, this case

---

[12] The defendant was sentenced as follows: Count 1 (possession of cocaine with intent to deliver), three years; Count 2 (possession of marijuana with intent to deliver), two years to be served concurrently with Count 1; Count 3 (possession of cocaine), time served; Count 4 (possession of marijuana), $100.00 fine.

is subject to independent appellate review. *State v. Woods*, 117 Wis. 2d 701, 715, 345 N.W.2d 457 (1984).

## SEARCH AND SEIZURE

The state in this case concedes that the garbage collector's prior agreement to give the defendant's garbage to the deputy sheriff made that collector an agent of the state for purposes of assisting in law enforcement activities. The state also agrees that a locked garage is entitled to some measure of privacy and is entitled to constitutional protection from unreasonable search and seizure. Finally, it is undisputed that the garbage collector entered the defendant's garage and took the garbage without a search warrant.

If the defendant voluntarily consented to the garbage collector's activities, the need to obtain a warrant was obviated. *Schneckloth v. Bustamente*, 412 U.S. 218, 219 (1973). The state has the burden of proving that the consent was freely and voluntarily given. *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968).

Balanced against the apparent need for consent searches[13] is the equally important requirement of as-

---

[13] "In situations where the police have some evidence of illicit activity, but lack probable cause to arrest, or search, a search authorized by a valid consent may be the only means of obtaining important and reliable evidence. [footnote omitted]. . . . If the search is conducted and proves fruitless, that in itself may convince the police that an arrest with its possible stigma and embarrassment is unnecessary, or that a far more extensive search pursuant to a warrant is not justified. In short, a search pursuant to consent may result in considerably less inconvenience for the subject of the search, and, properly conducted, is a constitutionally permissible and wholly legitimate aspect of effective police activity." *Schneckloth v. Bustamente*, 412 U.S. at 227–228.

suring the absence of coercion in obtaining such consent. Whether a consent was voluntary or the product of express or implied coercion must be determined from the totality of the circumstances. *Schneckloth*, 412 U.S. at 227; *State v. Rodgers,* 119 Wis. 2d 102, 110, 349 N.W.2d 453 (1984). In making that determination, account must be taken of subtly coercive police activities and the possibility that the person consenting was in a "vulnerable subjective state." *Schneckloth,* 412 U.S. at 229.

In the instant case, the defendant claims that the consent was not voluntary because he was subjected to deceptive police practices. He claims that he was deceived as to the identity of the garbage collector as well as the purpose of the garbage collector in taking the garbage. According to the defendant, the garbage collector impliedly represented that he was an ordinary collector collecting garbage to dispose of in the usual manner when, in fact, he was an agent for the deputy sheriff intending to give the garbage to the deputy.

If there was a deception in this case it was only as to the identity of the garbage collector, and this was not sufficient to vitiate the defendant's otherwise voluntary consent. In effect, the garbage collector was no different than an undercover agent for the state and "an entry by an undercover agent is not illegal if he entered for the 'very purposes contemplated by the occupant.'" *United States v. Ressler,* 536 F.2d 208, 211 (7th Cir. 1976), *quoting, Lewis v. United States,* 385 U.S. 206, 211 (1966). In this case, the garbage collector did enter the garage for the very purpose contemplated by the defendant; that is, he entered to obtain the garbage, to remove it from the defendant's premises, and haul it away.

■ The defendant claims that the garbage collector's delivery of the garbage to the deputy went beyond the purpose which the defendant contemplated when he allowed the garbage to be taken. It is apparent that the defendant contemplated routine collection and disposal of his garbage. Because we conclude there is no reasonable expectation of privacy in garbage once it has been routinely collected by garbage collectors, the risk of a police search of garbage is assumed in the routine disposal of garbage by municipal employees. Therefore, the delivery of the defendant's garbage to the deputy sheriff was consistent with the routine disposal contemplated by the defendant. The defendant's consent to routine disposal was sufficient to justify the search of his garbage.

■ Proper application of the fourth amendment to protect an individual's interest in garbage depends on whether that individual can claim a reasonable expectation of privacy in that garbage which has been invaded by government action. To determine whether such an expectation of privacy has been invaded involves two distinct inquiries. The first is whether the individual by his conduct has exhibited an actual, subjective, expectation of privacy. The second is whether that expectation is justifiable in that it is one which society will recognize as reasonable. *Smith v. Maryland*, 442 U.S. 735, 740–741 (1979).

A majority of jurisdictions which have dealt with the issue refuse to recognize any expectation of privacy in garbage after it has been removed from the premises by regular collectors.[14] In *United States v. Biondich*, 652

[14] *United States v. Terry*, 702 F.2d 299, 309 (2nd Cir. 1983), *cert. denied*, 103 S.C. 2095 (1983); *United States v. Vahalik*, 606 F.2d 99, 101 (5th Cir. 1979), *cert. denied*, 444 U.S. 1081 (1980); *United States v. Crowell*, 586 F.2d 1020, 1025 (4th Cir. 1978),

F.2d 743–745 (8th Cir. 1981), police officers approached the employee of the private garbage hauling service that regularly collected trash from the defendant's home and made arrangements to meet that collector after he picked up the defendant's garbage. On the regular collection day, the collector picked up the trash in the usual manner but kept the defendant's trash separate in the bin of the truck. The items found in the trash by police served as a basis for a warrant to search the defendant's home. The defendant moved to suppress the evidence found in his home claiming that the search of his garbage violated his fourth amendment rights. In *Biondich,* the court held:

"When a person makes arrangements with a sanitation service to have the items picked up, however, and when the items are placed in the designated place for collection and the regular collector makes the pickup in the usual manner on the scheduled collection day, the person loses his or her legitimate expectation of privacy in the items at the time they are taken off his or her premises." *Biondich,* 652 F.2d at 745.

The federal circuit courts dealing with the issue have gone even further and have consistently held that once garbage is placed out in an area of public access for regular collection, there is no reasonable expectation of privacy in that garbage. *United States v. Reicherter,* 647 F.2d 397, 399 (3rd Cir. 1981). In *United States v. Shelby,* 573 F.2d 971–973 (7th Cir. 1978), *cert. denied,* 439 U.S. 841 (1979), sanitation workers were asked to search the defendant's trash when they made their normal pickup of the defendant's trash. The evidence they found served as the basis for a warrant to search the

*cert. denied,* 440 U.S. 959 (1979); *United States v. Shelby,* 573 F.2d 971, 973 (7th Cir. 1978), *cert. denied,* 439 U.S. 841 (1978); *United States v. Mustone,* 469 F.2d 970, 972 (1st Cir. 1972); *United States v. Dzialak,* 411 F.2d 212, 215 (2nd Cir. 1971), *cert. denied,* 404 U.S. 883 (1971).

defendant's home. In *Shelby*, 573 F.2d at 973, the Seventh Circuit held: "In our view the placing of trash in the garbage cans at the time and place for anticipated collection by public employees for hauling to a public dump signifies abandonment."

The reasoning behind the majority view that there is no reasonable expectation of privacy in garbage after it has been removed from the premises by municipal garbage collectors is persuasive both under the fourth amendment and under the identical language of Article I, sec. 11 of the Wisconsin Constitution.[15] This reasoning is also consistent with the prior decisions of this court. In *Ball v. State*, 57 Wis. 2d 653, 656, 205 N.W.2d 353 (1973), two officers went behind the defendant's home without the defendant's consent and without a search warrant and searched a barrel used for burning trash. This court held that the search violated the defendant's fourth amendment rights. In so doing, however, this court said:

"While it might be contended that because defendant 'attempted' to burn the evidence, he thereby 'intended' to 'abandon' it, it would, nevertheless, seem that the decision to abandon the property under the facts of this

---

[15] The majority view has been criticized by one court. In *People v. Krivda*, 486 P.2d 1262 (Cal. 1971), *vacated*, 409 U.S. 33 (1972), *opinion reinstated*, 504 P.2d 457 (1973), *cert. denied*, 412 U.S. 919 (1973), the California Supreme Court rejected the majority view. The court, in *Krivda*, held that the placement of the trash barrels on the sidewalk did not constitute an abandonment and that a reasonable expectation of privacy continues in the trash until it is commingled with other trash and has lost its identity. *Krivda*, 486 P.2d at 1268.

The *Krivda* decision has been praised by a few writers who agree with its holding. *Cf.* 1 W. La Fave, *Search and Seizure*, § 2.6(c), at 382 (1978). Still *"Krivda* has been interpreted narrowly in California and rejected everywhere else." 1 Ringel, *Searches and Seizures, Arrests and Confessions*, sec. 8.5(a)(2), at 8–35 (2d ed. 1984).

case was a revocable decision which would not be made irrevocable until defendant either vacated the premises or in some way placed the barrel or its contents in 'public view' outside his expectation of privacy. . . .

"In the case at bar, the defendant had his 'barrel' in the back of his house on what would appear to be the curtilage of his house and hidden from the view of people passing by. There was no evidence that this was the type of container emptied by garbage men on a regular basis, or, for that matter, at all. In view of these facts and the above authorities, we are satisfied that the trash barrel was within defendant's expectation of privacy and the search of it was unlawful." *Ball*, 57 Wis. 2d at 662, 664.

The *Ball* decision recognizes that as trash moves farther from the home and closer to the public, the disposer's reasonable expectation of privacy diminishes. This is so for a number of reasons. First, the disposer's control over the trash diminishes with that movement to the point of total relinquishment at the time regular collectors remove it from his property. Under the terms used in *Ball*, the decision to abandon has become irrevocable. When this occurs and control is relinquished to strangers, it is inconceivable that the disposer had an actual expectation of privacy in light of his demonstrated intent to totally disassociate himself from the garbage both as to control and as to concern.

Even if the disposer had an actual expectation of privacy, "[i]n the real world to so view the status of one's discarded trash is totally unrealistic, unreasonable, and in complete disregard of the mechanics of its disposal." *Shelby*, 573 F.2d at 973. The contents of garbage bags or "cans could not reasonably be expected by defendant to be secure, nor entitled to respectful, confidential and careful handling on the way to the dump. Trash generally is not so highly regarded." *Shelby*, 573 F.2d at 973.

Second, as trash moves farther from the home, societal concern over the invasion of the privacy of the home by a search of garbage is diminished. Bush and Bly, *Expectation of Privacy Analysis and Warrantless Trash Reconnaissance after Katz v. United States,* 23 Ariz. L. Rev. 283, 315 (1981). In *Ball,* this court thought it significant that the garbage searched was in the "curtilage" of the home. *Ball,* 57 Wis. 2d at 664. Once garbage has been removed from the premises with the consent of the owner as in the instance case, that concern is absent.

In this case, the defendant contemplated routine removal and disposal of his garbage when he consented to the removal of it from the garage by the municipal garbage collector. By consenting to this removal, the defendant placed himself in essentially the same position as one who sets out his garbage for routine collection and has that garbage removed. Because there is no reasonable expectation of privacy in garbage that is removed by municipal garbage collectors in routine collection, the defendant had no reasonable expectation of privacy in garbage which was removed by the municipal collector pursuant to his consent. Therefore, the search of the defendant's garbage did not violate his rights under either the United States Constitution or the Wisconsin Constitution. The trial court properly denied the defendant's motion to suppress evidence seized from the defendant's garbage and evidence seized pursuant to the search warrant which was issued based in part upon evidence obtained from the garbage search.

## DOUBLE JEOPARDY

The defendant contends that the double jeopardy proscriptions of both the United States and Wisconsin

Constitutions were violated when he was convicted and sentenced for the felonies of possession of cocaine and marijuana with intent to deliver. He argues that because he was previously convicted, on his guilty plea, of the misdemeanor counts of possession of cocaine and marijuana, and because the drugs seized from his home on December 29th and seized from his leather shoulder bag on December 30th were from the same original supply, he was subjected to multiple prosecutions and multiple sentences for a single offense.

The court of appeals agreed with the defendant's contention and ordered the case remanded, the misdemeanor sentences vacated and the misdemeanor counts dismissed. The court of appeals relied on the reasoning of the United States Supreme Court decision in *Ohio v. Johnson*, 52 U.S. LW. 4748 (U.S. June 12, 1984). *Stevens*, 120 Wis. 2d at 343. We disagree. Because we conclude that the offenses in this case were different in fact, it is not necessary to determine the applicability of *Ohio v. Johnson* under the Wisconsin Constitution.

[8]
For offenses to be the same within the meaning of the double jeopardy provision, they must be the same in both law and fact. *Anderson v. State,* 211 Wis. 78, 87, 265 N.W. 210 (1936). They must comprise the same act and crime.

"It is generally accurate to say that there may be a conviction for more than one offense only where (a) each is based upon different conduct, or (b) if based on the same conduct, each offense requires proof of a fact not required by the other." F. Remington and A. Joseph, *Charging, Convicting and Sentencing the Multiple Criminal Offender,* 1961 Wis. L. Rev. 528, 545.

Because a lesser included offense requires no proof beyond that which is required for conviction of the greater offense, "[t]he greater offense is therefore by

definition the 'same' for purposes of double jeopardy as any lesser offense included in it." *Brown v. Ohio,* 432 U.S. 161, 168 (1977). Wisconsin also provides protection against conviction of both a greater and lesser-included crime in sec. 939.66, Stats. Possession of a controlled substance and possession of a controlled substance with intent to deliver may be considered the same since the former requires no proof beyond that which is required for the latter. Section 161.41 (1m) and (3), Stats. 1981–1982.

In the instant case, we conclude that although the lesser-included offense of possession and the greater offense of possession with the intent to deliver are the same in law, for purposes of double jeopardy, they are not the same in fact. Under Wisconsin law, offenses which are the same in law are different in fact if those offenses are either separated in time or are significantly different in nature. *State v. Eisch,* 96 Wis. 2d 25, 31, 291 N.W.2d 800 (1980).

We do not agree with the defendant's contention that the offenses were the same in fact because they involved drugs from the same supply. It would place an unbearable burden on the State to require that each time an individual was convicted of drug possession, the individual's remaining supply of that drug must be discovered and confiscated. If the state failed to discover that remaining supply prior to the conviction, the accused would be free to possess the remaining supply without fear of additional prosecution. Any clever drug enthusiast who could adequately hide a ton of cocaine, would allow himself to be convicted for possession of a minimal amount of that supply. Then, after satisfying the relatively minor penalty, he could continue to possess the remainder of the ton of cocaine without fear of prosecution. Such a result would be unreasonable.

In this case, we conclude that the offenses were not the same in fact because they were separated by a significant period of time. The simple possession charges related only to the defendant's conduct on December 30, 1979. The charges for possession with intent to deliver related to the possession of drugs on December 29, 1979. It was the defendant's continued possession of drugs on December 30th, after his possession of the larger quantity of drugs had been terminated by police confiscation that formed the basis of the simple possession charges.

It is true, as the defendant points out that "[t]he Double Jeopardy Clause is not such a fragile guarantee that prosecutors can avoid its limitations by the simple expedient of dividing a single crime into a series of temporal or spatial units." *Brown v. Ohio*, 432 U.S. at 169. The defendant, however, incorrectly claims that the interval between the possessions was artificial because it was created by the state. It was the action of the defendant himself that created this interval. The defendant separated out the smaller portion to take along on his vacation. It was also the defendant who continued his possession of these drugs on December 30th after the state had lawfully terminated his illegal possession of the larger supply on December 29th. The state was responsible for terminating the defendant's possession of the larger amount, but the defendant was responsible for continuing his possession of the smaller amount on December 30th.

Because the offenses on December 29th and December 30th were different in fact, convicting the defendant on all four counts did not violate the double jeopardy provisions of the United States or Wisconsin Constitutions, nor did it violate the prohibition against conviction for lesser-included offenses under sec. 939.66,

Stats. or the limitation on the number of convictions under sec. 939.71.

*By the Court.*—The decision of the court of appeals is reversed only as to the dismissal of the misdemeanor possession charges. The convictions and sentences on the misdemeanor charges of possession are reinstated. The remainder of the court of appeals decision affirming defendant's conviction of possession of cocaine with intent to deliver and possession of marijuana with intent to deliver is affirmed.

HEFFERNAN, C.J. (*dissenting*). I dissent for two reasons: (1) The consented-to entry was obtained by deception, which vitiated the voluntary consent,[1] and

---

[1] The facts impelling the nullification of the right of entry here are much more persuasive than those set forth in *State v. Rodgers*, 119 Wis. 2d 102, 349 N.W.2d 453 (1984); and I found those sufficient to cause me to join in the dissent from the majority view. In *Rodgers*, at least the householder knew that it was the police who sought entry. Here that fact was concealed. In accordance with the reasoning of the *Rodgers* dissent, the entry by deception should be considered involuntary. While, as a matter of precedent, I now acquiesce in the majority's holding in *Rodgers*, this case, on its facts, is far removed from that case. Here the unknowing householder was subjected to a deceitful, misrepresented entry by one, purporting to be a sanitation worker, who in fact was an agent of the sheriff's department. This case is a quantum leap beyond *Rodgers* in its suppression of civil liberties and the potential exposure of the public to unwarranted (literally) police surveillance.

There is some confusion, perhaps in my understanding, in the majority opinion. At the outset, the opinion appears to treat the garbageman's entry as not merely a consented entry but as a consented search. If that were correct, then there would be no need to explore the question of abandonment or reasonable expectations of privacy, for a voluntary, knowing, consent search sets all fourth amendment concerns aside. It seems clear to me, however, that this was not a consent "search," although for purposes of this dissent, I am willing to concede that there was a consent "entry" for the purpose of taking delivery of the package.

(2) even if there were an entry with the consent of the householder, that fact is irrelevant to the legal question of whether the householder has relinquished his right to privacy in the contents of bags of garbage upon the direct delivery of the garbage to a garbage collector for what is represented by the collector to be routine disposal in ordinary course of municipal sanitation services.

I write only on the latter issue and to discuss the simplistic, oft repeated, canard that "there is no right of privacy in garbage"; and I conclude that, under the facts here, the defendant had a reasonable expectation of privacy from state search.

If it is difficult to track the reasoning of the majority, I cannot be too critical, for the majority follows what appears to be the holding of courts generally— and the mental processes of those courts sometimes border on the irrational.

I need cite only one case to exemplify the rather cavalier disregard of constitutional rights that typifies the "reasoning" of some of the courts on which the present majority builds its case. In *United States v. Shelby*, 573 F.2d 971 (7th Cir. 1978), the court, after such irrelevant remarks as "garbage cans cannot be equated to a safety deposit box" (at 973), goes on to point out:

". . . the parties have overlooked one of the most adept garbage can intruders. Even in urban areas, neighborhood raccoons capably de-lid garbage cans, dump them over and sort out their contents for *all* to see." (Emphasis supplied.) (N. 3 at 974).

*Shelby* was a case in which sanitation workers of the City of Milwaukee were induced by the Federal Bureau of Investigation to inspect the garbage of a suspected bank thief and to turn over any objects that might incriminate the householder. Such objects were found and

turned over to the Federal Bureau of Investigation after the trash was taken from its usual place at the edge of the suspect's property and kept segregated from other garbage.

The court in *Shelby* gave as one of its reasons that, because raccoons could have opened the garbage cans and because the raccoons might have separated the garbage so that any passerby could have seen the incriminating bank wrappers, it was therefore constitutionally permissible for the police to do the same thing by using garbagemen as agents.

Whether or not the result was correct in *Shelby*, the bizarre analogy to the nocturnal scavenging habits of the raccoon seems inappropriate. The lesson of *Shelby* and similar cases seems to be that what can be accomplished by *ferae naturae*, raccoons or rats and not too well domesticated dogs, exonerates and immunizes police conduct of a similar nature.

How far we have strayed from what any lawyer schooled in the history of our civil liberties should consider the cutting edge—the line of demarcation between inadvertent, private, or animal action and state police action.

The principal was well stated by William Pitt when speaking to the House of Commons in 1763:

"The poorest man may in his cottage bid defiance to all the forces of the crown. It may be frail—its roof may shake—the wind may blow through it—the storm may enter—the rain may enter—but the King of England cannot enter!—all his force dares not cross the threshold of the ruined tenement!" (Quoted in McNamara, *2000 Famous Legal Quotations,* p. 515.)

Thus, it is elementary that the fact that non-state instrumentalities, even the elements, may act free of constitutional restraints does not confer on the state any rights it would not otherwise possess. Despite the

inappropriate analogy of the Seventh Circuit, a police officer or a police officer's agent is not a raccoon.

Nevertheless, within the limits of their facts, cases such as *Shelby* are not totally unreasonable. The garbage in *Shelby* was set outside within reach of the public and within the reach of any errant raccoon. Thus, to give rationality to such opinions as *Shelby*, one must conclude that garbage was placed in a situation, either within or without the curtilage where the circumstances were such that the contents of the garbage could be opened by animals and then, literally, be scattered to the winds for *all* to see, including a passing police agent. Certainly, if there were evidence that garbage cans were regularly blown over by the wind, pecked at by birds, torn apart by marauding animals, and exposed to public view, it would indeed be unreasonable to conclude that there could be much expectation of privacy in the trash so disposed. But this reasoning from what speculatively could happen to expose garbage to eventual police "plain view" in hypothetical cases is almost irrelevant to the question of whether a person has a right to privacy in garbage in a particular case. While there might have been some justification, though limited, in adopting the rule—that there is no right of privacy in garbage—when the touchstone was abandonment of property rights, no such broad and sweeping dictum can persist where the right is not one of property, but a civil and human right, the right of privacy.

*Shelby*, despite its lack of focus on the constitutional problem of state action, does, however, acknowledge that, "Each case, however, must turn upon its own facts." At 974. Thus, at least by reference to other cases (see page 974), it recognizes that the maxim, "no right of privacy in garbage," is not a rule of law.

But lest the precedents which the majority has elected to follow serve as a model for the rationale of this dissent, I shall attempt an analysis of why there was a reasonable expectation of privacy in the contents of the particular garbage bags delivered by the householder directly to garbage collectors for the Village of River Hills, despite the clear and unmistakable abandonment of his property rights in the trash. *Katz v. United States,* 389 U.S. 347 (1967), makes it clear that the fourth amendment protects the expectations of persons to privacy, whether or not under particular circumstances all separable property rights have been abandoned.

In the instant case the garbageman-police agent came within the curtilage as the result of the express action of the householder, who operated the electronic garage door control in response to the garbage collector's request. Certainly, however, the defendant, to use the words of *Katz,* is entitled to no privacy in what he exposed to the garbageman even within the garage, clearly within the curtilage. But that is all he did— expose closed bags of garbage. By the delivery to the garbageman no property rights were retained, but did that conduct constitute a relinquishment of the right of privacy against government search.

It is frequently said that, when one abandons property, that person terminates his right to privacy in the property and may not complain about a subsequent seizure (see Mascolo, *The Role of Abandonment in the Law of Search and Seizure: An Application of Misdirected Emphasis,* 20 Buff. L. Rev. 399 (1971)).

Under the facts characterized as abandonment, the traditional view has been that the fourth amendment or its state constitutional counterpart is not even implicated—that the former owner's rights in the property were by the abandonment simply beyond the scope of the fourth amendment. Since *Katz,* abandonment,

*simpliciter,* cannot be the touchstone—or at least the sole determinant—of the state's right to inspect garbage.

The majority, despite *Katz,* equates physical abandonment with a relinquishment of the right to privacy in the article. That this is not necessarily true is stated by the Minnesota Supreme Court in *City of St. Paul v. Vaughn,* 306 Minn. 337, 237 N.W.2d 365 (1975).

LaFave in *Search and Seizure,* vol. 1, sec. 2.6, page 368, summarized the facts of *City of St. Paul* and quotes the language of the Minnesota court:

"[P]olice followed a suspect into a drycleaning establishment, saw him tuck something underneath the counter, retrieved the item (an eyeglass case) and found narcotics paraphernalia inside. Though the defendant had 'discarded the eyeglass case in a location to which any member of the public had equal access,' he contended it could not be said that he had abandoned it because 'his intention was merely to hide the case, not to relinquish his right of ownership.' The court did not agree:

" 'The distinction between abandonment in the property-law sense and abandonment in the constitutional sense is critical to a proper analysis of the issue. In the law of property, the question, as defendant correctly states, is whether the owner has voluntarily, intentionally, and unconditionally relinquished his interest in the property so that another, having acquired possession, may successfully assert his superior interest. . . . In the law of search and seizure, however, the question is whether the defendant has, in discarding the property, relinquished his reasonable expectation of privacy so that its seizure and search is reasonable within the limits of the Fourth Amendment. . . . In essence, what is abandoned is not necessarily the defendant's property, but his reasonable expectation of privacy therein.'

"Where the presence of the police is lawful and the discard occurs in a *public place* where the defendant cannot reasonably have any continued expectancy of privacy in the discarded property, the property will be deemed abandoned for purposes of search and seizure." (Emphasis supplied.)

The question posited in *St. Paul* that is of relevance in this case is whether the "relinquishment occurred under such circumstances which indicate he retained no justified expectation of privacy in the object." See *LaFave, supra*, at 369–70. Abandonment of the property rights to a thing is not always synonymous with the relinquishment of the right of privacy to the forces of the state.

In this case, the defendant had placed his bagged garbage in his locked garage. The garbageman, having been made the cat's-paw for the police, agreed to pick up the garbage on the regular pick-up day and then to deliver it to the police for their inspection. On December 14, 1979, the grabage had not been set outside of the garage for collection. Accordingly, with commendable zeal, zeal not demonstrated in the record to be the normal procedure, the collector went to the home, rang the door bell, and asked to get the garbage. The defendant activated the door control, which permitted the garbageman to enter the, until then, locked attached garage and to take possession of the garbage bags.

While the state at oral argument contends that the householder permitted the collector to come in and "do whatever he wanted to do with the garbage," the majority opinion is more careful with the facts. It recognizes that the householder merely recounted at the suppression hearing that he opened the garage so the collector could do what he had just said he wanted to do, *i.e.,* to enter and pick up the garbage.

The state would prefer, apparently, to give less than scrupulous attention to the facts and would like to find in the housholder's *post litem* testimony an express authorization for the handling of the garbage at the collector's volition. This is not an inference that reasonably can be drawn from the facts. What the householder did was to retain possession in his locked garage until there was a request for the garbage by the col-

lector and the direct transfer of possession from the householder's shielded curtilage to the garbage collector, who was the apparent agent of the Department of Public Works but who in fact was serving the sheriff's department of Milwaukee county in this transaction.

Thus, there is no stage in this transaction where in fact the objects in the garbage bags were in an area of public scrutiny. Even the raccoons never had a go at these garbage bags. It is clear there was a relinquishment of a possessory right—probably all of the defendant's possessory or reversionary rights—but does this constitute a relinquishment of the right of privacy in the sense of *Katz*. To state the facts here accurately and then to contrast them with those cases founded on depositing garbage at the curb or in communal dumpsters furnishes the answer in the negative. There was no relinquishment of the right of privacy.

Even where courts are concerned only with a "seizure" from a private home at a spot near the curtilage, they seem obsessed with the cant, "there is no right of privacy in garbage," because, they repetitively reason, if the public or animals can examine the garbage, then why not the police. Certainly, because of the facts in the instant case, the rationale of those cases is not appropriate. Moreover, no case has been called to our attention holding there is a relinquishment of the right of privacy where there has been a direct transfer from a locked curtilage, entered only after a consent given for a limited purpose.

This case, therefore, appears to be unique, because it was a direct transfer for a specific purpose. It has general implications, however, for if, under the circumstances here, there is a reasonable expectation in the privacy of the delivered garbage, future decisionmakers will have to give a little more attention to the actual facts instead of mouthing outworn and discredited maxims such as, "there is no right to assert a fourth amend-

ment right in respect to abandoned property" or "there is no right of privacy in garbage." Thus, under *Katz,* the placing of garbage at a curb for pick-up is not a willy-nilly relinquishment of all the depositor's rights. It is a procedure authorized in this case by the municipality for the express purpose of disposal by the proper sanitary authorities. Garbage so placed is not "abandoned" to the vagaries or whims of the world. It is put there for an express purpose—the disposition of garbage in a way to avoid the eyesore accumulations of trash and to maintain sanitary and healthful methods of waste disposal.

*People v. Edwards,* 71 Cal. 2d 1096, 80 Cal. Rptr. 633, 458 P.2d 713 (1969), is a case employing the appropriate *Katz* analysis. In *Edwards,* the garbage was placed in the open backyard. Its holding that the search of the cans in the yard was unlawful goes beyond what we are required to decide here, or, in the instant case, the garbage was delivered on the curtilage premises directly to the proper authorities for disposal. There is not even an intimation in the facts of this case that the circumstances encouraged or contemplated anything but prompt disposal in the due course of garbage collection. Yet the language of *Edwards* is significant because it states why ordinary law-abiding citizens ought not to countenance the government rummaging in the waste products of household life:

"In the light of the combined facts and circumstances it appears that defendants exhibited an expectation of privacy, and we believe that expectation was reasonable under the circumstances of the case. We can readily ascribe many reasons why residents would not want their castaway clothing, letters, medicine bottles or other telltale refuse and trash to be examined by neighbors or others, at least not until the trash has lost its identity and meaning by becoming part of a large conglomeration of trash elsewhere. Half truths leading to rumor

and gossip may readily flow from an attempt to 'read' the contents of another's trash." *Edwards,* at 1104.

*Edwards* sensibly recognizes that the average person has a right of privacy in the garbage emanating from the household. This is because "abandonment" is only for a specific purpose. While, in the instant case as in *Edwards,* the householder parted with his household exuvia with the intention of doing so forever, that is not the whole story, nor does the conclusion that such was his intention have much to do with the right of privacy against state encroachments.

As Professor LaFave points out, at 377, citing *United States v. Kahan,* 350 F. Supp. 784 (S.D. N.Y. 1972), *Katz* made it clear that " 'the question is not whether there has been abandonment in the property law sense, . . . but rather whether there has been abandonment of a reasonable expectation of privacy as to the area searched or the property seized.' "

It is difficult to believe that anyone would seriously contend that there is not a reasonable expectation of privacy in garbage against the prying eyes of government except in circumstances where the plain view doctrine could come into play.

Almost all the intimate details of one's personal life may be revealed by what is placed in the trash, including personal matters which would cover the gamut from how one's alimentary canal functions to the brand or quantity of liquor consumed in the household. Even the most intimate aspects of a person's relations with others may be revealed. Certainly, the publications one reads, the bills one receives, the financial obligations one has, and the names of persons who have written are likely to be revealed. Whether one is the recipient of public relief or of social security and a multitude of other matters that are of personal concern are likely to be revealed to "Big Brother" if there is—and under no circumstances

can there be—no right of privacy in trash or garbage against government intrusions.

Is this expectation of privacy in garbage "unreasonable"? As has been well stated by one commentator, LaFave, *supra,* at 378, the real question is whether the expectation of privacy asserted in respect to a particular transaction is one that society would recognize as not likely to be infringed upon by the *state*. It is a societal concern with the reasonableness of state conduct that is the key to the citizen's expectation of privacy. It must be remembered that it is the state that is constrained by the fourth amendment, not the general public, hungry animals, or mischief makers. LaFave points out at 378:

"Under *Katz*, for the expectation of privacy to receive Fourth Amendment protection, it must be one 'that society is prepared to recognize as "reasonable." ' This means that the ultimate question put by *Katz* is 'whether, if the particular form of surveillance practiced by the police is permitted to go unregulated by constitutional restraints, the amount of privacy and freedom remaining to citizens would be diminished to a compass inconsistent with the aims of a free and open society.' Surely the type of police surveillance employed in *Edwards* should not go unregulated, for a society in which all 'our citizens' trash cans could be made the subject of police inspection' for evidence of the more intimate aspects of their personal life upon nothing more than a whim is not 'free and open.' "

It is beyond argument that the extent to which police surveillance may go is a matter of policy depending upon a court's concept of a free and open society, which is not to be trammeled by the unrestrained forces of the police. That policy must be determined by constitutional concepts of civil liberty and not by medieval notions of property law.

It seems hardly debatable that government should not, under the facts of this case, have the option to go

through a person's trash without first demonstrating probable cause. It is true, of course, that no constitutional issue would arise if a private person rummaging through garbage saw some suspect material and brought it to the attention of the police, who used that information to secure a warrant, but this is merely to restate the obvious, the fourth amendment and the state constitutional counterpart restrict only official action. The fact that animals and parties other than the state may forage through a citizen's garbage with constitutional impunity does not give leave for the government to do so. The state has admitted that the garbage collector was the agent of the police; hence, here there was state action. It is irrelevant that others are free to revel in the defendant's garbage, like Templeton, the Rat.[2] We are concerned only with activity of the sheriff's department in making an unlawful search of the defendant's garbage in violation of what is a reasonable expectation of a citizen that the government will not abuse its privilege as a garbage collector or dupe others to act as its agent to invade the constitutionally protected right of privacy.

Chief Justice Jay Rabinowitz eloquently dissented from the majority's opinion in *Smith v. State,* 510 P.2d 793 (Alaska 1973), on grounds similar to those stated

[2] "Templeton, the Rat" is one of the principal characters of E. B. White's "Charlotte's Web." He characterized his pleasures in life as "eating, gnawing, spying, and hiding." At 29.

"The rat had no morals, no conscience, no scruples, no consideration, no decency, no milk of rodent kindness, no compunction, no higher feeling, no friendliness, no anything." At 46. He reveled in garbage. After one of his forays into the garbage, he recounted his experience to the barnyard animals:

" 'What a night!' he repeated, hoarsely, 'What feasting and carousing! A real gorge! I must have eaten the remains of thirty lunches. Never have I seen such leavings, and everything well-ripened and seasoned with the passage of time and the heat of the day. Oh, it was rich, my friends, rich!' " At 148.

here. It should be noted, however, that even the majority in *Smith* acknowledged a right of privacy in one's garbage, but found none in the circumstances of that case, where the garbage was placed in a dumpster with that of a number of other persons. The *Smith* majority opinion stands for the proposition that there is a right of privacy in garbage. The majority in *Smith*, however, equates the placing of garbage in a communal garbage dumpster to an act exposing it to a "plain view." It emphasizes that, under the circumstances, the right of privacy is minimal because:

"[I]t would be reasonable to expect trash to be accidentally removed from the dumpster by running children, passing cars, stray dogs, or even a visitor of another tenant in the building." At 798.

Again, we point out the circumstances of nongovernmental action envisaged by the majority in *Smith* are totally irrelevant here and they were irrelevant in *Smith*. What is significant, however, in *Smith* is that the right of privacy in garbage was recognized. The question in the majority's view was whether that right was so attenuated in the circumstances there as to constitute no expectation at all. *Smith*, both in its majority and dissent stands four-square for the right of privacy in one's garbage. There are no facts in the present case which are similar to the ones in *Smith* upon which the majority in the instant case could base its conclusion that the right of privacy was dissipated.

In *Smith* the majority typified its case as a close one. In the instant case, once one gets beyond the trite characterization of "abandonment" and the cliche of "no right of privacy in garbage" derived from ancient property law, it is clear that the present case is not even close.

It is reasonable for the householder to expect that, when garbage is delivered directly to the authorized

collector, it will be absolutely free of the prying eyes of the state's police. It is unreasonable under these circumstances for the state, without proof of probable cause, at the whim of its officers and without the intervention of a neutral magistrate, to inspect the trash of Wisconsin citizens.

I also believe that even the ordinary curbside pick-up embraces the expectation of privacy from the *police* and certainly the "raccoon" mentality evinced by some courts cannot plausibly be relied upon when the delivery is directly to the municipality's authorized agent. It is conceded that the garbage bags were opaque and no knowledge of their contents could be gained from external inspection. There was a reasonable expectation that there could not be a "plain view" of the contents from external scrutiny.

Here we need not go into the analysis of whether the police could do indirectly (by the garbageman) what they could not do directly. It is acknowledged that the garbageman was the agent of the police, and to the extent the fourth amendment applies, it applies against the state and all of its agents. True, the garbageman was involved in a dual persona—that as a garbage collector and also as an agent of the police. Some cases would indicate that, once the garbage transfers to the collector, it is in the public domain and subject to examination by a police officer as a member of the general public.

*Croker v. State,* 477 P.2d 122 (Wyo. 1970), purports to so hold. This seems far-fetched, for the real question, which *Croker* begs, is: What is the expectation of privacy once there has been delivery to the trashman? The trashman is an agent of the municipality. He is, in any event, an agent of the state; and his turning over trash to the police by arrangement is just as much state action as though undertaken directly by the police. *Croker* would have us believe that, while there may be an initial

right to privacy in garbage on one's own premises, once the garbageman moves the garbage to a public place, it may be plundered at will by the police or anyone else.

If there is a right to privacy in garbage—and I conclude that can be the only rational and constitutional viewpoint—it is a strange notion indeed that the garbage may be intercepted in a nonroutine way by the police and then inspected in violation of constitutional rights. The reasonable expectation of a citizen is that, once the garbage is delivered to the collector, either constructively by placing on the curb or actually as in the present case, it will be sent to the dump, incinerator, or processing plant in a routine manner and will not by connivance or deception be intercepted by police.

As LaFave points out (at 384), the garbageman who acts as a tool of the state's police cannot be equated with the informer to whom a person communicates an incriminating fact. Here there was no communication at all by the householder by the delivery of the garbage. The obvious intent was not to communicate, but to permit the pick-up and disposal of the trash.

Because a householder is obliged to dispose of his garbage, and because he knows that the purpose of garbage collection and disposal is its destruction, it is reasonable for the householder to have an expectation of privacy in the garbage, an expectation that the garbage will be handled in the usual manner, without interception by agents of the state.

Were a scavenging animal to open garbage and strew it to the winds for the plain view examination by the police, such view would not be a search subject to the fourth amendment. That, however, is not what happened here. In fact, I doubt that it has ever happened in the context of a reported case. Rather, the theory is that, had an animal ruptured the container, the police could view its contents. Hence, the specious argument goes:

Why not, then, let the police break into the garbage and make an inspection. Whatever reason supports such an analysis, under any circumstance, I find minimal, and it is simply not applicable here.

Delivery was directly to the garbage collector, who was the secret agent for the police. Because there was an expectation that garbage so delivered would be free from the warrantless examination by the police, and because routine disposal was reasonably contemplated, the subsequent inspection was an unreasonable search and seizure, and the evidence so obtained, which was used to secure the subsequent warrant, should be suppressed. The fruits of the second search, pursuant to the warrant, which were tainted by the prior unconstitutional intrusion, must also be suppressed.

I therefore dissent.

JUSTICE SHIRLEY S. ABRAHAMSON and JUSTICE WILLIAM A. BABLITCH join in this dissent.