[No. 13307-9-III. Division Three. November 14, 1995.]

THE STATE OF WASHINGTON, *Respondent*, v. ANTONIO VERDA LOPEZ, *Appellant*.

756

*Keith W. Howard*, for appellant.

*Gary Riesen, Prosecuting Attorney*, and *James A. Hershey, Deputy*, for respondent.

THOMPSON, C.J. — Antonio Verda Lopez appeals his convictions for two counts of possession of cocaine with intent to deliver. We hold the two convictions are for the same offense, and thus are a double jeopardy violation. We affirm the conviction for the remaining count and remand for resentencing.

On February 8, 1993, the Columbia River Drug Task Force was working undercover with a confidential informant, Shelly Harris. Ms. Harris knew a person living at the Bruce Hotel in Wenatchee, who she believed would purchase a large quantity of cocaine. The plan was that Ms. Harris and Detective Michael Simmons would go to the hotel in her car. She would go inside and get the

person, then drive him to Lincoln Park and negotiate a deal. Detective Simmons was given two ounces of cocaine to make the deal.

Ms. Harris entered the hotel at approximately 5:30 P.M., while Detective Simmons waited. Within a short while, she came out with Mr. Lopez, who got into the back seat of the car. Ms. Harris offered to sell Mr. Lopez two ounces of good rock cocaine. Mr. Lopez seemed interested. Upon Detective Simmons' suggestion, they drove to Lincoln Park. Several other task force members, including Detectives Bruce Long and Larry Aiken, followed. Ms. Harris briefly parked in a lot in the park. Detective Simmons showed the cocaine to Mr. Lopez. Detective Simmons and Ms. Harris each told him the price for the two ounces would be $1,300. Mr. Lopez said he did not have the money with him, but he had it at the hotel. They drove back to the hotel, and Mr. Lopez went inside. Within a couple of minutes, he returned to the vehicle with Rogelio Hernandez. Mr. Lopez and Mr. Hernandez got into the back seat; Detective Simmons and Ms. Harris were in front. Mr. Hernandez, who spoke better English than Mr. Lopez, asked to see the cocaine. On Detective Simmons' insistence, they first returned to the parking lot at Lincoln Park. The surveillance team again followed to await an arrest signal from Detective Simmons.

At Lincoln Park, Detective Simmons handed the cocaine to Mr. Hernandez. Mr. Hernandez and Mr. Lopez examined it closely and conversed in Spanish. Mr. Hernandez again asked the price. Detective Simmons repeated the $1,300 price. Mr. Lopez and Mr. Hernandez conversed again, and Mr. Hernandez then asked Detective Simmons if he would take $1,000. Detective Simmons said, "Yes." Mr. Hernandez pulled out some money; he and Mr. Lopez counted out $1,000. They handed the money to Detective Simmons; he gave them the cocaine, which Mr. Lopez put in his left front pants pocket. Detective Simmons saw Mr. Lopez reach across and appear to hand something to Mr. Hernandez with a closed fist. Mr. Hernandez appeared to put an item in his pocket.

Detective Simmons then gave the bust signal, and several officers converged on the Harris vehicle. Detective Long shined his flashlight in the back seat and saw Mr. Lopez put his hand in his right front pocket, pull out the cocaine and leave it on the seat. The officers then arrested Mr. Lopez and Mr. Hernandez.

Detective Aiken took Mr. Lopez into custody. He recovered $600 in currency from Mr. Lopez' left front pants pocket, along with an envelope containing fourteen individual quarter-gram bindles of cocaine, weighing a total of 4.7 grams. In Mr. Lopez' right front pants pocket was $208 in currency. His wallet contained $18.50. The officers found no drug user paraphernalia on either Mr. Lopez or Mr. Hernandez.

Officer Bruce Nash recovered two baggies of cocaine from the floorboard in the back seat of the car. It appeared to be the cocaine that was sold to Mr. Lopez.

Detective Long testified about how cocaine dealers generally package their wares. The seller normally purchases quantities of one ounce or more at wholesale prices, cuts the drugs with a neutral substance such as inositol, and then repackages them into smaller baggies or packages such as grams for resale. These smaller quantities typically appear in paper bindles or very small plastic baggies with the end tied or heat-sealed. These small quantities typically sell for $20 to $50 each. The ounce sizes sell for $500 to $1,000. The street value of the two ounces of cocaine purchased by Mr. Lopez, if sold by the gram at the prevailing price of $80, would have been $4,560. Mr. Lopez' cost was $1,000. In Detective Long's experience, among the indicators that cocaine is being possessed with intent to deliver are a large number of small individual packages and large quantities such as two ounces, as was the case here. These factors led Detective Long to recommend charging Mr. Lopez with intent to deliver.

Mr. Lopez admitted going with Ms. Harris to buy cocaine on February 8 because he was an addict and consumed the drug at the rate of about a gram per day.

He said he spent an estimated $200 to $300 per week on his habit. Mr. Lopez testified Mr. Hernandez came with him as an interpreter, and that Mr. Hernandez counted out $1,000, and Mr. Lopez gave it to the officer in exchange for the cocaine. Mr. Lopez testified he then put out his hand so that Mr. Hernandez could give him any money left over from the deal. He denied giving any cocaine to Mr. Hernandez. He testified all of the money used in the transaction was his own, and that he had earned it working construction. He had no idea how much he earned in 1992. Mr. Lopez admitted at the time of arrest he also possessed some cocaine that he had purchased earlier, and that he sometimes buys a two- or three-month supply.

The State charged Mr. Lopez with two counts of unlawful possession of cocaine with intent to deliver and one count of delivery of cocaine to a person under age 18 (Mr. Hernandez) in a public park. The case went to jury trial on April 13-14, 1993.

The jury convicted Mr. Lopez of the two counts of possession of cocaine with intent to deliver, but acquitted him of the delivery charge. The court imposed concurrent forty-two-month, standard range sentences. This appeal followed.[1]

## DOUBLE JEOPARDY

■ We first address Mr. Lopez' argument the convictions for two counts of possession with intent to deliver subject Mr. Lopez to double jeopardy. The double jeopardy clauses of the Fifth Amendment and Wash. Const. art. I, § 9 prohibit multiple punishments for the same offense. *State v. Gocken*, 127 Wn.2d 95, 896 P.2d 1267 (1995). Mr.

---

[1]Mr. Lopez' brief does not include assignments of error and issues pertaining to the alleged errors, in technical violation of RAP 10.3(a)(3). However, his argument makes the issues reasonably clear, and we therefore are able to reach the merits. *State v. Olson*, 126 Wn.2d 315, 893 P.2d 629 (1995).

Lopez contends here[2] that the two convictions for possession with intent to deliver actually are based on a single act, and that he therefore has been punished twice for the same offense.[3]

■■ For multiple acts to constitute the "same offense," they must be the same both in law and in fact. *State v. Vladovic*, 99 Wn.2d 413, 423, 662 P.2d 853 (1983). Double jeopardy questions frequently arise when a defendant is convicted of multiple, different crimes arising from the same set of events. *See, e.g., Albernaz v. United States*, 450 U.S. 333, 101 S. Ct. 1137, 67 L. Ed. 2d 275 (1981); *State v. Calle*, 125 Wn.2d 769, 888 P.2d 155 (1995). The question in that circumstance is whether the Legislature *intended* to authorize separate punishments. *Albernaz*, 101 S. Ct. at 1145; *Calle*, 125 Wn.2d at 778-80. These cases address whether the offenses are the same *in law*.

Other cases address whether multiple offenses are the same *in fact. See State v. McFadden*, 63 Wn. App. 441, 452, 820 P.2d 53 (1991), *review denied*, 119 Wn.2d 1002 (1992); *see also State v. Garcia*, 65 Wn. App. 681, 690, 829 P.2d 241, *review denied*, 120 Wn.2d 1003 (1992). The question in these cases is whether the events are so related as to merge into a single offense. *Garcia*, 65 Wn. App. at 690.

Here, there is no question that Mr. Lopez' convictions are the same offense at law; they are based on violation of the same statute, RCW 69.50.401. The question, then, is whether the two convictions were *in fact* one offense for double jeopardy purposes.

■ The State argues Mr. Lopez' possession of the fourteen bindles of cocaine (which he obtained before the

---

[2]Mr. Lopez did not raise the double jeopardy issue at trial. In fact, he proposed jury instructions for each separate count and did not object to any of the instructions given. No merger instruction was offered or given. However, as an allegation of a manifest error affecting his constitutional right to be free from double jeopardy, the issue is properly raised for the first time on appeal. RAP 2.5(a)(3).

[3]The fact that the sentences are concurrent does not shield the case from double jeopardy scrutiny. *State v. Calle*, 125 Wn.2d 769, 772-75, 888 P.2d 155 (1995).

transaction) is separate from his possession of the two ounces of cocaine (which he obtained during the transaction). The State contends Mr. Lopez possessed two separate quantities of the drug, at different times and locations. This argument appears to be based in part on the fact that Mr. Lopez acquired the cocaine from more than one source and possessed the drugs in different ways. However, it is difficult to see how the source of contraband or how it is held should have an effect on the crime of possession.

Separating a defendant's possessions on this basis would create proof problems in other contexts. For example, RCW 69.50.401(a)(1)(i)(B) dramatically increases the penalty for possession of two or more kilograms of controlled substances. If the source of the drug or the manner in which it was possessed was a determining factor, a careful defendant could avoid the heightened penalty simply by making sure he acquired them in or divided them into amounts of less than two kilograms. *See also* RCW 69.50.401(e) (making it a misdemeanor to possess forty grams or less of marijuana).

The State also points out that Mr. Lopez possessed cocaine at different times and places. While any event can be split into increasingly smaller units, "[t]he Double Jeopardy Clause is not such a fragile guarantee that prosecutors can avoid its limitations by the simple expedient of dividing a single crime into a series of temporal or spatial units." *Brown v. Ohio*, 432 U.S. 161, 169, 97 S. Ct. 2221, 2227, 53 L. Ed. 2d 187 (1977) (holding auto theft and joyriding during nine-day period were a single offense under Ohio law).

In *McFadden*, the police interrupted the defendant as he was dumping a bag of cocaine into a toilet in an apartment. Officers retrieved the bag, which contained 5.5 grams of cocaine. The detectives then searched the van in which the defendant had arrived and found 83.9 grams of cocaine. *McFadden*, 63 Wn. App. at 443. The defendant was convicted of two counts of possession of a controlled

substance with intent to deliver. On appeal, the court held the evidence showed two distinct crimes, i.e., different quantities of cocaine and different locations. *McFadden*, 63 Wn. App. at 451-52.

Similarly, in *State v. Stevens*, 123 Wis.2d 303, 367 N.W.2d 788, *cert. denied*, 474 U.S. 852 (1985), officers found illicit drugs during a search of the defendant's home. Officers arrested the defendant the next day as he was returning from a vacation. *Stevens*, 367 N.W.2d at 793. In the defendant's baggage were more drugs, which he said were from the same supplies as those seized from his home a day earlier. *Id.* Noting that offenses are different in fact if they are "either separated in time or are significantly different in nature," the court rejected the defendant's double jeopardy argument.[4] *Id.* at 798.

Here, Mr. Lopez possessed cocaine in a continuous, uninterrupted series of events that was the focus of the prosecution against him. Unlike *McFadden*, in which the drugs were discovered in separate searches, and unlike *Stevens*, in which the drugs were discovered in searches on different days, Mr. Lopez possessed cocaine from multiple sources during a relatively short period of time. His possession of the cocaine from the undercover officers merged with his possession of the fourteen bindles he brought with him. His possession was a single offense. The dual convictions therefore subjected Mr. Lopez to double jeopardy in violation of the state and federal constitutions.

## REQUEST FOR NEW COUNSEL

Mr. Lopez also argues the trial court erred in refusing to appoint new counsel for Mr. Lopez before trial. On April

---

[4]The *Stevens* court held it was irrelevant that the two quantities of drugs were from the same source as those discovered earlier. *Stevens*, 367 N.W.2d at 798. Its reasoning was that if officers failed to discover all of a defendant's supply of drugs, a defendant could possess the remainder with impunity after prosecution based on the original discovery. *Stevens*. If it is irrelevant that the source of drugs is *the same*, it also should be irrelevant that the source is *different*.

7, 1993, the trial court conducted a readiness conference, during which Mr. Lopez was arraigned on an amended information. After the court explained the charge, the following exchange occurred:

THE DEFENDANT: I have a question.

THE COURT: Sir, go ahead.

THE DEFENDANT: Does a police officer that was selling have the right to sell?

MR. DELONG [defense counsel]: Your Honor, I've just advised Mr. Lopez that some of the statements he was prepared to make probably ought not to be made in court being recorded.

THE COURT: Mr. Lopez, you need to talk about that, I think, with your attorney because I don't want you to say anything in front of me that might not be in your best interest at trial since everything you say is being taken down by Ms. Nelson, our court reporter. So talk to Mr. DeLong.

THE DEFENDANT: Well, I want a different attorney because this one isn't helping me at all.

THE COURT: Well, Mr. Lopez, I'm not going to appoint you another attorney. And so, Mr. Lopez, I'm going to ask you how do you plead with respect to Count I, unlawful possession of a controlled substance with intent to deliver in a park, cocaine, guilty or not guilty?

THE DEFENDANT: Not guilty.

 A defendant does not have an absolute, Sixth Amendment right to choose any particular advocate. *Wheat v. United States*, 486 U.S. 153, 159 n.3, 108 S. Ct. 1692, 1697 n.3, 100 L. Ed. 2d 140 (1988); *State v. DeWeese*, 117 Wn.2d 369, 375-76, 816 P.2d 1 (1991). A court has discretion in deciding whether a particular defendant's reasons for dissatisfaction merit substitution of counsel. *Wheat*, 486 U.S. at 164; *DeWeese*, 117 Wn.2d at 376 (citing *State v. Sinclair*, 46 Wn. App. 433, 730 P.2d 742 (1986), *review denied*, 108 Wn.2d 1006 (1987)).

Mr. Lopez contends, however, that the court erred in

failing to inquire into his reasons for requesting a new attorney.[5] He relies on *State v. Dougherty*, 33 Wn. App. 466, 655 P.2d 1187 (1982), *review denied*, 99 Wn.2d 1023 (1983), in which the defendant did not trust his appointed attorney and asked to appear pro se. In *Dougherty*, the issue was whether the defendant had knowingly and intelligently waived his Sixth Amendment right to counsel. *Dougherty*, 33 Wn. App. at 468. The court noted:

> The problem faced by a defendant who distrusts his attorney is solved by the trial court's inquiry into the defendant's subjective reasons for his distrust. When that hearing occurs, reasons such as those held by Mr. Dougherty will be evaluated by the court. A penetrating and comprehensive examination by the court of the defendant's allegation will serve as the basis of whether different counsel needs to be appointed for direct representation at trial, or for standby purposes.

*Dougherty*, 33 Wn. App. at 471. Arguably, this language does not apply directly here, since Mr. Lopez was not asking to appear pro se. As a practical matter, however, the circumstances are similar. When a defendant lacks faith in his appointed attorney and the court refuses to permit a substitute, the defendant must choose between continuing with his appointed counsel, or appearing pro se. *See, e.g., DeWeese*, 117 Wn.2d 369; *State v. Staten*, 60 Wn. App. 163, 802 P.2d 1384, *review denied*, 117 Wn.2d 1011 (1991). Because of the potential implications on a defendant's Sixth Amendment rights, a court in this situation should inquire carefully into the defendant's reasons for the distrust.

The State relies on the following language from *DeWeese*, 117 Wn.2d at 376: "When an indigent defendant fails to provide the court with legitimate reasons for the as-

---

[5]Mr. Lopez does not directly contend his trial counsel's performance was constitutionally ineffective, but alleges the court was required to conduct a "penetrating and comprehensive examination" of the reasons for Mr. Lopez' request. *State v. Dougherty*, 33 Wn. App. 466, 471, 655 P.2d 1187 (1982), *review denied*, 99 Wn.2d 1023 (1983). The specific details of defense counsel's subsequent performance are relevant to the question whether the error was harmless, which we discuss below.

signment of substitute counsel, the court may require the defendant to either continue with current appointed counsel or to represent himself. *Sinclair*, [46 Wn. App.] at 437-38." Neither *DeWeese* nor *Sinclair* supports the State's implication that a court need not inquire into the matter. Indeed, it is precisely because of the potential implications on a defendant's Sixth Amendment rights that a court should conduct a hearing:

> [The defendant] argues that a district court, faced with a motion for new counsel, and little knowledge of the substance of the complaint — as was indeed the case here — "has a duty to inquire into the basis for the client's objection to counsel and should withhold a ruling until reasons are made known." *Brown v. United States*, 264 F.2d 363, 369 (D.C. Cir. 1959) (Burger, J., concurring), *cert denied*, 360 U.S. 911, 79 S. Ct. 1299, 3 L.Ed.2d 1262 (1959). We agree.
>
> That such an inquiry must take place follows from the very nature of the law governing attorney substitution motions. Attorney-client conflicts only justify the grant of a substitution motion when "counsel and defendant are so at odds as to prevent presentation of an adequate defense." *United States v. Hillsberg*, 812 F.2d 328, 333 (7th Cir. 1987)[, *cert. denied*, 481 U.S. 1041 (1987)]. Unless a substitution motion or the accompanying affidavit of counsel is extremely detailed — which, as here, is often not the case — a court cannot make such a determination without conducting a proper hearing at which both attorney and client testify as to the nature of their conflict. For this reason, the courts of appeals have held that " 'the district court must engage in at least some inquiry as to the reasons for the defendant's dissatisfaction with his existing attorney.' " *McMahon v. Fulcomer*, 821 F.2d 934, 942 (3d Cir. 1987) (quoting *United States v. Welty*, 674 F.2d 185, 187 (3d Cir. 1982) . . . .
>
> . . . [The defendant's] substitution request was clearly not sufficiently detailed to allow the district court to dismiss it out of hand without further inquiry. The district court was required to make a more detailed investigation of the nature of [the defendant's] conflict with his attorney and thereby maintain the integrity of [the defendant's] sixth amendment

right to counsel. Its failure to do so was an abuse of its discretion.

*United States v. Morrison*, 946 F.2d 484, 498-99 (7th Cir. 1991), *cert. denied*, 113 S. Ct. 826 (1992) (citations omitted).

Here, the court summarily denied Mr. Lopez' request for new counsel, without inquiry into reasons for his dissatisfaction. By failing to inform itself of the facts on which to exercise its discretion, the court abused its discretion.

■ A separate question is whether the error was harmless. The "peremptory denial" of a defendant's request for new counsel is harmful only if counsel's performance actually violated the defendant's Sixth Amendment right to effective assistance of counsel. *Morrison*, 946 F.2d at 499. To prove an attorney's representation was unconstitutionally ineffective, a defendant must show (1) that, considering all the circumstances, the attorney's performance was deficient, i.e., that it fell below an objective standard of reasonableness; and (2) that the defendant was prejudiced, i.e., there is a reasonable probability that the result would have been different but for the attorney's deficient performance. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995) (citing *State v. Thomas*, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987); *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).

Mr. Lopez argues here that trial counsel's performance was deficient in various ways, including failing to raise the issue whether the two convictions placed him in double jeopardy. Our decision here to reverse one of the convictions removes any prejudice Mr. Lopez may have suffered. The court's failure to inquire into Mr. Lopez' reasons for requesting a new attorney was harmless.

## SUFFICIENCY OF EVIDENCE

■ ■ Mr. Lopez also argues the evidence was insufficient to support the verdict. He contends that, while there was proof he possessed cocaine, there was no evi-

dence he possessed it with *intent to deliver*. When a defendant raises the issue of sufficiency of the evidence, the test is "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 278, 61 L. Ed 2d 126 (1979) (italics omitted). All reasonable inferences must be drawn in the State's favor and interpreted most strongly against the defendant. *State v. Partin*, 88 Wn.2d 899, 906-07, 567 P.2d 1136 (1977). A jury may infer intent "where a defendant's conduct plainly indicates the requisite intent as a matter of logical probability." *State v. Stearns*, 61 Wn. App. 224, 228, 810 P.2d 41, *review denied*, 117 Wn.2d 1012 (1991). However, possession of a controlled substance alone is insufficient to establish an inference of intent to deliver. *State v. Harris*, 14 Wn. App. 414, 418, 542 P.2d 122 (1975), *review denied*, 86 Wn.2d 1010 (1976).

 Cases generally require at least one additional factor to establish intent to deliver. *See State v. Hagler*, 74 Wn. App. 232, 236, 872 P.2d 85 (1994) (large amount of cocaine and $342 in cash in hands of juvenile); *State v. Taylor*, 74 Wn. App. 111, 123, 872 P.2d 53 (presence of baggies, scales, and large amount of cash), *review denied*, 124 Wn.2d 1029 (1994); *see also State v. Brown*, 68 Wn. App. 480, 484, 843 P.2d 1098 (1993). We have held previously that even possession of a large amount of controlled substances, without some additional factor, is insufficient to establish intent. *State v. Hutchins*, 73 Wn. App. 211, 216, 868 P.2d 196 (1994) (citing *State v. Mejia*, 111 Wn.2d 892, 766 P.2d 454 (1989); *State v. Llamas-Villa*, 67 Wn. App. 448, 836 P.2d 239 (1992); *State v. Lane*, 56 Wn. App. 286, 786 P.2d 277 (1989); *State v. Simpson*, 22 Wn. App. 572, 590 P.2d 1276 (1979)). Finally, an officer's opinion that a defendant possessed more drugs than normal for personal use is insufficient to establish intent. *Hutchins*, 73 Wn. App. at 217; *Brown*, 68 Wn. App. at 484-85.

The State points to the amount of cocaine Mr. Lopez possessed, and Detective Long's testimony that those amounts were indicative of an intent to make subsequent retail deliveries. Mr. Lopez possessed two ounces of cocaine, plus 4.7 grams in fourteen bindles. This amount presumably is large enough to at least raise the possibility that Mr. Lopez intended to deliver it. *See Lane*, 56 Wn. App. at 297 (one ounce considered large amount). However, proof of possession of this large amount of drugs, without more, may not support a finding of intent. *Hutchins*, 73 Wn. App. at 216. Even the detective's opinion that the amount was more than normal for personal use does not establish intent. *Hutchins*, 73 Wn. App. at 217. In addition to the large amount of cocaine involved, some other indicium of intent is required.

We hold that Mr. Lopez' possession of large amounts of cash after the transaction indicates an intent to deliver. After the sale, Mr. Lopez had in his possession a total of $826.50. This is $500 more than the officer's original asking price for the two ounces, and is suggestive that Mr. Lopez intended to distribute the large amount of cocaine, rather than retain it for his own use.

We hold the dual convictions violated Mr. Lopez' right against double jeopardy, and merge into a single offense. We affirm the remaining, merged conviction, and remand for resentencing on that basis.

MUNSON and SCHULTHEIS, JJ., concur.