IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 78036-1-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| PARKS, AUSTIN JOHN, | ) | |
| DOB: 10/19/1988, | ) | |
| | ) | |
| Appellant. | ) | |

BOWMAN, J. — Austin John Parks appeals his jury convictions of two counts of third degree assault. Parks contends that (1) the trial court abused its discretion by denying his motion for new counsel, (2) the State improperly commented on his prearrest silence, (3) the prosecutor engaged in misconduct by misstating the law of self-defense, (4) he received ineffective assistance of counsel at trial, (5) cumulative error deprived him of a fair trial, and (6) we should strike certain legal financial obligations from his judgment and sentence. We affirm the convictions but remand to the trial court to strike the criminal filing fee, DNA[1] collection fee, and nonrestitution interest from his judgment and sentence.

---

[1] Deoxyribonucleic acid.

Citations and pin cites are based on the Westlaw online version of the cited material.

FACTS

On the evening of December 17, 2015, Lisa Driscoll and her adult son George Miller drove to the Marysville Papa John's to pick up a pizza. While waiting for their order, Miller walked to a neighboring smoke shop. After picking up their food, Driscoll left Papa John's and drove partway into the "only parking spot available" in front of the smoke shop to wait for Miller. She did not "pull all the way into" the parking spot.

Parks and his girlfriend Tonya Morgan[2] drove into the crowded lot looking for a parking space. They stopped behind Driscoll's car and Morgan reached over from the passenger seat to honk the horn. Driscoll saw the car "immediately behind me" and Morgan standing outside of Parks' car. She heard Morgan "screaming" at her. Driscoll conveyed[3] that she was not ready to leave the parking space. The two women "briefly" argued and Morgan went back to the passenger side of Parks' car.

Driscoll "couldn't pull forward because of the island" and "couldn't back up because of [Parks'] car," so she started to get out of her car to "see how close they were to the bumper" of her car. Parks got out of his car "angry and yelling" at Driscoll to move her car. The two began to argue near the rear of Driscoll's car. While Driscoll and Parks were arguing, Miller returned from the smoke shop. He stood at the passenger door of Driscoll's car and started to argue with Parks while Driscoll "immediately went to the driver's side" of her car to leave.

---

[2] Tonya Morgan and Parks later married. We refer to Morgan by her maiden name for clarity and intend no disrespect by doing so.

[3] Driscoll claims she told Morgan, "You can't have it right now." Morgan testified that Driscoll "started screaming profanities" and "flipped me off."

Amy Ebert, a customer in the smoke shop who was in the checkout line behind Miller, walked out of the store "a minute or less" after Miller. She saw the argument. According to Ebert, Driscoll "was not out of her car" at that time and Parks "has the [driver's side] door open and is outside [his] car." Ebert testified that while Miller was "standing at the passenger side of [Driscoll's] car," she heard "elevated voices" and saw Driscoll then get "out of her vehicle as well[,] asking what I presume is her son to get back into the car because they're leaving." Ebert testified that she heard a "lot of swear words . . . from both sides. You know, do you want to go? I'll kick your ass. Things of that nature going back and forth between [Parks and Miller]." Ebert testified that the verbal argument escalated but she did not see any physical touching.[4] She said that everyone stayed "in the same spot"—Parks stood just outside his open driver's side door, Miller remained at the passenger side of Driscoll's car, and Driscoll stood "outside of her car on the driver's side" telling Miller that "we're leaving."

Ebert then saw Parks "duck into his car" and pull out a can of pepper spray "very quickly." Ebert testified that Parks "instantly" sprayed Driscoll for several seconds "at a very close range" from her head to her knees. Miller started to move around the back of Driscoll's car and Parks sprayed him as well. Ebert watched as Parks immediately "gets in his car, backs up, and pulls out of the parking lot."

All of the witnesses described the entire incident as "quick." Ebert testified that the "whole thing lasted probably less than 25 seconds all together." On

---

[4] Ebert testified, "There — you know, there was banter going on back and forth between the two males, but physical, like touching or anything, no."

3

cross-examination, Ebert clarified that the time from Parks and Miller arguing to when Parks pepper sprayed Driscoll was "a little bit longer than 25 seconds, but I think the whole incident was under three minutes."

Driscoll had her cell phone in her hand during the entire altercation and "was already on the phone with [911]." She gave the police the license plate number of the car Parks was driving. Parks also called 911. Parks reported that "he had sprayed somebody with pepper spray" but hung up before giving any details.

Morgan testified that Parks acted in self-defense and pepper sprayed Miller first. She claimed Miller "kept coming towards" Parks in an aggressive manner, "hollering" and "screaming," prompting Parks to reach for the pepper spray. She said that Parks warned Miller to stop before Parks sprayed him in the eyes for "[j]ust a second." She testified that Parks then sprayed Driscoll because she assaulted Parks as he sprayed Miller. According to Morgan, Parks "kept telling her to get off me" before he pepper sprayed Driscoll.

Morgan testified that because Parks got some of the pepper spray in his eyes, she "got [him] into the back seat" and drove away. Morgan said she called 911 from Parks' phone using the "speaker phone" function so that they were both on the call with the 911 dispatcher. Morgan did not remember ending the 911 call. It was her "understanding [that] a police officer was supposed to contact us by phone."

Police later tried to contact Parks as part of their investigation. They left messages at the phone number Parks used to call 911 and with Parks' mother.

4

Parks did not respond. After several unsuccessful attempts to reach Parks, the police referred the case to the prosecutor's office.

The State charged Parks with one count of assault of Driscoll in the third degree and one count of assault of Miller in the third degree. Before trial, Parks made a motion to discharge his court-appointed attorney. The court denied his motion.

A jury convicted Parks of both charges. The court sentenced Parks within the standard range and imposed restitution, a $200 criminal filing fee, a $500 victim assessment, and a $100 DNA collection fee. Parks appeals.

ANALYSIS

Motion To Discharge Counsel

Parks argues that the court abused its discretion by denying his motion to discharge his court-appointed attorney before trial. We disagree.

We review a trial court's decision not to appoint new counsel for abuse of discretion. State v. Varga, 151 Wn.2d 179, 200, 86 P.3d 139 (2004). A court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds. State v. Quismundo, 164 Wn.2d 499, 504, 192 P.3d 342 (2008).

A defendant "has no constitutional right to his choice of appointed counsel." State v. Stenson, 132 Wn.2d 668, 765-66, 940 P.2d 1239 (1997). To warrant substitution of counsel, the defendant must show " 'good cause,' " such as a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication. State v. Davis, 3 Wn. App. 2d 763, 790, 418 P.3d 199 (2018)

(quoting State v. Thompson, 169 Wn. App. 436, 457, 290 P.3d 996 (2012)). The court should grant a motion to discharge only where conflicts between appointed counsel and the defendant are so significant that they would prevent an adequate defense. Stenson, 132 Wn.2d at 734. A trial court considering a motion to discharge appointed counsel must " 'inquire thoroughly into the factual basis of the defendant's dissatisfaction' sufficient to reach an informed decision." Davis, 3 Wn. App. 2d at 790[5] (quoting Thompson, 169 Wn. App. at 462).

Parks claims that the trial court abused its discretion in denying his motion to discharge counsel because it failed to engage in "any inquiry of any kind" as to the basis of Parks' dissatisfaction with his attorney. He contends that the court failed to inform itself of the facts on which to exercise its discretion as required by State v. Lopez, 79 Wn. App. 755, 904 P.2d 1179 (1995).

In Lopez, the defendant told the court that he wanted " 'a different attorney because this one isn't helping me at all.' " Lopez, 79 Wn. App. at 764. The court responded, " 'I'm not going to appoint you another attorney.' " Lopez, 79 Wn. App. at 764. Division Three of our court determined that such a summary denial of a request to discharge counsel without inquiring into any of the reasons for the defendant's dissatisfaction with his attorney is an abuse of the court's discretion. Lopez, 79 Wn. App. at 767.

But here, Parks clearly expressed the reasons that he wanted to discharge his attorney. During the hearing on Parks' motion for new counsel, his

---

[5] Internal quotation marks omitted.

6

attorney read the court a letter Parks wrote detailing his complaints. The letter states, in pertinent part:

> "I voiced my frustrations to [defense counsel] regarding her lack of communication with me. At that time she told me to come to court an hour early so that her and I could meet before court started.
>
> "On January 6th, 2016, I did exactly that. I arrived at court at 9:30 a.m. to meet with [defense counsel]. She was not able to meet with me until 10:15 a.m. It was a very brief meeting. . . .
>
> " . . . [She] had an extremely poor attitude and was very rude . . . . Her behavior was very unprofessional.
>
> "I . . . also feel that [defense counsel] is not representing me fairly. For instance, on January 6th, 2017, . . . she asked me a few specific questions regarding my case. When I answered her questions truthfully and honestly, she called me a liar and repeatedly stated that she knew I was lying, that I needed to tell her the truth.
>
> "I strongly feel that I can no longer work with [defense counsel] to resolve these legal matters."

The court gathered more information before issuing its ruling. The court asked the prosecutor and Parks' attorney to respond and gave Parks a second chance to address the court:

> THE COURT: Okay. And is the State taking any position?
>
> [PROSECUTOR]: I'm skeptical of some of the alleged facts written into those letters and I'm also somewhat unsympathetic that he had to allegedly wait some time for [defense counsel] to talk to him given his tardiness at court this morning.
>
> And, also, it doesn't appear that he's met the standard in regards to asking for new counsel. He certainly is entitled to counsel but not to counsel of his choosing. So the State is eager to move these cases forward and asks the Court to deny that motion at this time.
>
> THE COURT: Alright. And do you have any response?
>
> [DEFENSE COUNSEL]: No, Your Honor.
>
> . . . .
>
> . . . .
>
> . . . I don't know if Mr. Parks has anything further he'd like to add for the Court.
>
> THE DEFENDANT: No.

7

THE COURT:    Okay.  So it sounds like, in kind of cutting through all of this, there was a missed appointment.  Then there was some problem, again, connecting, leading to some frustration.
I think I would agree; I don't think that what I have heard meets the standard for assigning new counsel.  So I am going to deny the request.

Parks clearly expressed his reasons for requesting a new attorney and the court did not abuse its discretion in denying his motion to discharge counsel.

Prearrest Silence

Parks argues that we should reverse his convictions because the State impermissibly commented on his prearrest silence in violation of the Fifth Amendment to the United States Constitution and article I, section 9 of the Washington Constitution.  We disagree.

We first note that Parks cites State v. Easter, 130 Wn.2d 228, 922 P.2d 1285 (1996), in support of his argument.  He acknowledges that Salinas v. Texas, 570 U.S. 178, 133 S. Ct. 2174, 186 L. Ed. 2d 376 (2013), and State v. Magana, 197 Wn. App. 189, 389 P.3d 654 (2016),[6] have specifically abrogated Easter and its progeny.[7]  But Parks claims that the self-incrimination provision in article I, section 9 of the state constitution is more protective than the provision in the Fifth Amendment.  And he contends that the court in Magana reached its

---

[6] Abrogated on other grounds by State v. Johnson, 4 Wn. App. 2d 352, 421 P.3d 969, review denied, 192 Wn.2d 1003, 304 P.3d 260 (2018).

[7] In Salinas, the United States Supreme Court determined that absent an express invocation of the right to silence, the Fifth Amendment is not an obstacle to the State's introduction of a suspect's prearrest silence as evidence of guilt.  Salinas, 570 U.S. at 191. "Legally, this is not an area where our state's constitution affords greater protection than the federal constitution."  Magana, 197 Wn. App. at 195.  As a result, "the Fifth Amendment analysis set forth in Easter, [State v.]Lewis[, 130 Wn.2d 700, 707, 927 P.2d 235 (1996)], and their progeny is no longer good law."  Magana, 197 Wn. App. at 195.

conclusion without engaging in a Gunwall[8] analysis, so he urges this court to conduct such an analysis here. Because we conclude that the State did not improperly comment on Parks' prearrest silence, we need not conduct a Gunwall analysis.

A comment on a defendant's silence occurs when the State uses a defendant's constitutionally protected silence to its advantage, "either as substantive evidence of guilt or to suggest to the jury that the silence was an admission of guilt." Lewis, 130 Wn.2d at 707. For example, in Easter, our Supreme Court determined that an officer's characterization of Easter's prearrest silence as evidence that he was " 'trying to hide or cloak' " his guilt was an impermissible comment. Easter, 130 Wn.2d at 233, 241. Similarly, in State v. Keene, 86 Wn. App. 589, 592, 594, 938 P.2d 839 (1997), a detective's testimony that she warned Keene that she would turn his case over to prosecutors if he did not contact her, coupled with the prosecutor's argument to the jury highlighting Keene's failures to contact the detective and asking the jury if these were " 'the actions of a person who did not commit these acts,' " rose to impermissible comments.

In contrast, our Supreme Court determined in Lewis that a detective's testimony that he called Lewis and told him " 'if he was innocent he should just come in and talk to me about it' " was not a comment on the defendant's prearrest silence. Lewis, 130 Wn.2d at 703, 705-06. The court emphasized that "[t]he detective did not say that Lewis refused to talk to him, nor did he reveal the

---

[8] State v. Gunwall, 106 Wn.2d 54, 720 P.2d 808 (1986).

fact that Lewis failed to keep appointments." Lewis, 130 Wn.2d at 706. Also, "[t]here was no statement made during any other testimony or during argument by the prosecutor that Lewis refused to talk with the police," nor was there "any statement that silence should imply guilt." Lewis, 130 Wn.2d at 706.

Here, Marysville Police Officer Bryant Gerfin testified about his efforts to reach Parks as follows:

> Q. Did you make any efforts to contact that person [who called 911 and reported they had pepper sprayed someone] by phone?
> A. I did.
> Q. And tell us about that. What efforts did you make?
> A. I called multiple times to the phone number hoping to make contact and I wasn't able to.
> Q. And was there a voicemail at all?
> A. There was not. There was no voicemail set up.
> Q. How many times do you think you called that phone number?
> A. At a very minimum, three or four.
> . . . .
> Q. When you went to the address that you believed was associated with that license plate, was Mr. Parks at that address?
> A. He was not.
> Q. Were you able to speak with him at that time?
> A. I was not.

And Detective Christopher Jones testified:

> Q. . . . [W]hat else did you do in this case?
> A. Eventually I contacted Mr. Parks' mother.
> Q. Okay. And what was your reason for contacting Mr. Parks' mother?
> A. To see if she could get in touch with him.
> Q. And up until this point, had you been able to — had law enforcement been able to contact Mr. Parks?
> A. No.
> Q. Now, when you contacted Mr. Parks' mother, were you able to get any information in order to contact him?
> A. No.

10

Q. So after calling her, at any point in the investigation were you able to speak with him about what happened?

A. No.

This case is like <u>Lewis</u>. The officers did not testify that Parks failed to attend appointments or that he refused to speak with the police. Nor did the prosecutor elicit any testimony that Parks purposefully refused to contact the police. Indeed, Parks himself elicited the only testimony that he was at all aware of the efforts of law enforcement to reach him. Defense counsel asked Morgan:

Q. . . . So at some point during this period while were you in California, did you speak with [Parks'] mother?

A. Yes.

Q. And from that conversation you learned that police officers had contacted her?

A. Yes.

Further, the prosecutor did not try to use the testimony about law enforcement's efforts to contact Parks to the State's advantage.[9] The State did not argue that Parks' failure to contact the police was substantive evidence of guilt or suggest to the jury that it was an admission of guilt. The officers' testimony did not amount to an improper comment on Parks' prearrest silence.

## Prosecutorial Misconduct

Parks argues that the prosecutor "grossly misstated the law of self-defense" and impermissibly shifted the burden of proof to the defense. We conclude that the prosecutor's remarks were improper but that Parks waived his

---

[9] Parks claims that the State used his silence to its advantage because the officers testified that they "referred the case to the prosecutor's office precisely because Parks did not return their calls and provide his 'side of the story.' " But this misconstrues Detective Jones' testimony about why he referred the case to the prosecutor after failing to reach Parks. He explained that "[y]ou always want to try to get every side of the story, but at some point you just go with what you have."

claim of prosecutorial misconduct.

To show prosecutorial misconduct, the defendant must establish that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial. State v. Thorgerson, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). When a defendant fails to object to prosecutorial misconduct at trial, he is deemed to have waived any error unless the prosecutor's conduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice. State v. Emery, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). Under this heightened standard, the defendant must show that " 'no curative instruction would have obviated any prejudicial effect on the jury' " and that the misconduct resulted in prejudice that " 'had a substantial likelihood of affecting the jury verdict.' " Emery, 174 Wn.2d at 761 (quoting Thorgerson, 172 Wn.2d at 455). We review alleged improper statements by the State in the context of the argument as a whole, the issues involved in the case, the evidence referenced in the statement, and the trial court's jury instructions. State v. Anderson, 153 Wn. App. 417, 427, 220 P.3d 1273 (2009).

RCW 9A.16.020 provides:

The use, attempt, or offer to use force upon or toward the person of another is not unlawful in the following cases:
. . . .
(3) Whenever used by a party about to be injured, or by another lawfully aiding him or her, in preventing or attempting to prevent an offense against his or her person, or a malicious trespass, or other malicious interference with real or personal property lawfully in his or her possession, in case the force is not more than is necessary.

"Necessary" means "that no reasonably effective alternative to the use of force

appeared to exist and that the amount of force used was reasonable to effect the lawful purpose intended."  RCW 9A.16.010(1).

Parks contends that the prosecutor "misrepresented the point at which Parks needed to consider reasonable alternatives" to the use of force.  The prosecutor argued in rebuttal:

> There wasn't self-defense here based on the evidence. When you look at lawful force, it has to be necessary. . . .
> . . . .
> Was it necessary?  There is no duty to retreat.  And you may not consider it as a reasonable alternative.  But a reasonable alternative, how about when you get there, just park in another space?  What about when you get there, not escalate the situation. Getting in an argument.  Excuse me, ma'am, we'd like to park in this space.  Would you mind moving your car?  Screw you.  But we'd like to park in this space.  Screw you.  Did it require an escalation if that's really what happened?  Were there reasonable alternatives here?  Absolutely.

We agree with Parks that the prosecutor's remarks were a misstatement of the law.  "The justification of self-defense must be evaluated from the defendant's point of view as conditions appeared to [him] at the time of the act." State v. Allery, 101 Wn.2d 591, 594, 682 P.2d 312 (1984); RCW 9A.16.020(3). Here, according to Morgan's testimony, "the time of the act" was when Miller "started coming towards [Parks]" in an aggressive manner.  Not while Parks was looking for a parking spot nor when Morgan asked Driscoll to move her car.

But a curative instruction could have alleviated any prejudice from the prosecutor's remarks.  Before closing argument, the trial court properly instructed the jury that the use of force is lawful "when the force is not more than is necessary" and that "[n]ecessary means that, under the circumstances as they reasonably appeared to the actor at the time, . . . no reasonably effective

13

alternative to the use of force appeared to exist." Had Parks objected to the prosecutor's remarks, the trial court could have reiterated the proper instructions, which would have eliminated any possible confusion and cured any potential prejudice. Parks waived his claim of prosecutorial misconduct.

### Ineffective Assistance of Counsel

Parks claims that his attorney was ineffective because she did not object to testimony about his prearrest silence or to the prosecutor's improper comments in closing argument.

To establish ineffective assistance of counsel, a defendant must show that the attorney's performance fell below an objective standard of reasonableness and that the deficiency prejudiced the defendant. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). We need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. Strickland, 466 U.S. at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed." Strickland, 466 U.S. at 697.

To establish prejudice resulting from ineffective assistance of counsel, a defendant must show that there is a " 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " State v. Thomas, 109 Wn.2d 222, 226, 743 P.2d

816 (1987)[10] (quoting Strickland, 466 U.S. at 694). It is not enough for the defendant to show that the errors "had some conceivable effect" on the outcome of the proceeding. Strickland, 466 U.S. at 693.

Parks first argues that his attorney's failure to object to law enforcement testimony about his prearrest silence was deficient. Parks' argument fails because the testimony was not an improper comment on his prearrest silence.

Parks next argues that his attorney was ineffective because she failed to object to the prosecutor's improper remarks in closing argument. Parks contends that the prosecutor "encouraged the jury to nullify the law and convict Parks because his actions leading up to the imminent need to use force" were "unreasonable." He claims that it is "all too likely that the jury did as the State asked, declining to find Parks' actions justified because of his behavior beforehand." We disagree.

The inordinate focus of this case was not on whether Parks should have left the scene as a reasonable alternative to self-defense. Rather, the parties devoted nearly all of their closing remarks to whether Parks faced a credible threat worthy of self-defense at all.

Morgan testified that Parks was standing at the driver's door of his car when Miller moved toward him aggressively. She claimed that Parks warned Miller to stop, but Miller continued toward him, forcing Parks to pepper spray Miller. And Morgan testified that Driscoll forced Parks to pepper spray her because Driscoll attacked him while he was defending himself against Miller.

---

[10] Emphasis omitted.

Defense counsel argued during closing that Morgan's testimony was credible and that the actions of Miller and Driscoll justified Parks' use of pepper spray to defend himself.

Driscoll and smoke shop customer Ebert both contradicted Morgan's testimony that Parks acted in self-defense. They testified that Driscoll was standing by the driver's side door of her car when Parks pepper sprayed her first. They both testified that Miller was standing at the passenger side door of Driscoll's car until the moment Parks sprayed Driscoll. Ebert also testified that Miller was trying to come to Driscoll's aid and had just started to move around the back of Driscoll's car when Parks pepper sprayed him. The State argued that Driscoll and Ebert's testimony was more credible and that Parks overreacted when he sprayed Driscoll and Miller. The prosecutor told the jury that such "force" was "[n]ot necessary. Not needed. Not required."

Additionally, as discussed earlier, the court properly instructed the jury on the law of self-defense. We presume that jurors follow the court's instructions absent evidence to the contrary. State v. Kirkman, 159 Wn.2d 918, 928, 155 P.3d 125 (2007). Parks has not shown a reasonable probability that the outcome of his trial would have been different had his attorney objected to the prosecutor's improper remarks.

## Cumulative Error

Parks argues for reversal under the cumulative error doctrine. Applying the cumulative error doctrine is "limited to instances when there have been several trial errors that standing alone may not be sufficient to justify reversal but

when combined may deny a defendant a fair trial." State v. Greiff, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). The doctrine does not apply when errors have "little or no effect" on a trial's outcome. Greiff, 141 Wn.2d 910 at 929.

Parks fails to establish several trial errors. The cumulative error doctrine does not apply here.

### Legal Financial Obligations

Parks argues that we should strike the criminal filing fee, DNA collection fee, and nonrestitution interest from his judgment and sentence under ENGROSSED SECOND SUBSTITUTE HOUSE BILL 1783, 65th Legislature, Regular Session (Wash. 2018), and State v. Ramirez, 191 Wn.2d 732, 747-50, 426 P.3d 714 (2018). The State concedes that legislative action has eliminated the trial court's authority to impose these legal financial obligations. We agree.

We affirm Parks' convictions for third degree assault but remand to strike the criminal filing fee, DNA collection fee, and nonrestitution interest from his judgment and sentence.

Brunner, J

WE CONCUR:

Chun, J.

Appelwick, J.