IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>     Respondent,<br><br>    v.<br><br>DARRYL GLEN PETERSON,<br><br>     Appellant. | No. 85553-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — Darryl Glen Peterson was convicted of murder in the first degree. On appeal, Peterson challenges the trial court's denial of his pretrial motion to suppress the results of a DNA test and his motion to discharge his counsel after the jury was empaneled. Peterson also challenges the admission of videos of him holding what appeared to be a firearm and the audio accompanying additional videos, which he claims were unduly prejudicial. Further, he claims his counsel's failure to object to the audio portions of certain videos constituted ineffective assistance of counsel. Peterson also claims cumulative error and challenges the imposition of the victim penalty assessment (VPA). We affirm the conviction but remand to the trial court to strike the VPA from his sentence.

FACTS

In the early morning of January 29, 2017, Patrice Pitts was shot near the intersection of Third Avenue and Cherry Street in the Pioneer Square

neighborhood of Seattle, Washington. The Seattle Police Department (SPD) responded to the scene and attempted to administer aid before calling for medical assistance. Medics conducted CPR on Pitts and transported him to Harborview Medical Center, where he was declared deceased. The police collected evidence at the scene, including shell casings, clothing, and a backpack, as well as surveillance videos from the area.

Detective Donna Stangeland was assigned to investigate Pitts's death. Upon watching the surveillance videos, Stangeland became suspicious of a green van that seemed to "mirror[] the movements of the victim as he walked around . . . up until the time" that Pitts was shot, so she published a bulletin advising law enforcement with any information about the green van to contact her. In response to the bulletin, an officer told Stangeland that he had conducted a traffic stop of the van on February 6, 2017, and provided identifying information for the occupants of the van and in-car footage. Stangeland compared the footage from the officer's traffic stop and the surveillance footage and determined that the vehicles were the same make, model, and color and had similar permits and stickers. Stangeland testified that based on the information from the traffic stop, she was able to determine that Darryl Glen Peterson was the registered owner of the green van.

Stangeland also testified that surveillance videos from around the time of the shooting showed a silver Porsche SUV arriving near the intersection of Third Avenue and Cherry Street at the same time as the green van. The Porsche continued on while the van remained in the area, and after Pitts was shot, both

2

vehicles left the area. An automated license plate reader also recorded the silver Porsche in the Pioneer Square area around the time Pitts was shot. A search of the Porsche's license plate revealed that it was registered to Peterson.

On February 22, SPD began surveilling the two vehicles. Pursuant to a search warrant, police arrested Peterson and seized his Porsche. They retrieved a cell phone from inside the vehicle but released Peterson soon afterwards.

On February 28, Stangeland obtained a search warrant for the records of Peterson's Facebook profile. The records included two videos posted to Peterson's Facebook profile on January 1 and January 18, 2017, respectively, in which Peterson was holding what appeared to be a firearm.

On March 30, 2017, Stangeland obtained warrants to search Peterson's green van, silver Porsche, and residences. On April 3, Peterson was arrested and charged with murder in the first degree in violation of RCW 9A.32.030(1)(a) and unlawful possession of a firearm in the first degree.

At a discovery hearing on August 15, 2022, the State sought to collect a buccal sample from Peterson. However, Peterson refused, stating, "I'm not doing this," asserting that he had been in custody for 64 months already and had only been made aware of the request for a new sample the day before the hearing. Peterson sought time to evaluate the new DNA testing technology, STRmix software,[1] and confer with his attorney, which the court granted. After the

---

[1] A Washington State Patrol Crime Lab DNA analyst testified at trial that STRmix software conducts a "statistical assessment . . . and attempts to pull out individual [profiles] for each of the people" who may have contributed to the sample being analyzed, provides different combinations that could explain the evidence profile, and provides weightings for each of the different combinations.

continuance, however, Peterson refused to consent, and the court authorized the use of force to obtain the DNA sample. Using STRmix software, the Washington State Patrol analyst determined that Peterson's DNA was on the shell casings recovered from the scene. Peterson sought to suppress the results of the STRmix analysis on the basis that previously, DNA had not been an issue, and the new evidence "change[d] the complexity" of his defense. The court denied the motion but, as a remedy, granted Peterson a continuance to allow him to prepare for trial.

At a pretrial hearing on May 9, 2023, Peterson objected to the admission of the January 1 and January 18 Facebook videos showing Peterson holding what appears to be a firearm, arguing that the State could not prove that the firearms were real or that they were the weapons used to shoot Pitts. He also claimed the videos were intended to "paint him in a very particular way that is completely irrelevant to whether or not Mr. Peterson shot Mr. Pitts," especially given the "disgusting" and "sexist" language used in the January 1 and 18 videos. The State responded that the videos were probative and relevant because they were taken relatively close in time to the shooting and showed Peterson wearing clothing similar to that of the person in the surveillance footage. The trial court admitted the videos, finding them central to showing whether Peterson carried a firearm and probative of his credibility and identity. However, it excluded the audio of Peterson reciting song lyrics, concluding it was more prejudicial than probative.

On May 11, Peterson requested the court to discharge his counsel, citing a "lack of communication" between the two and claiming that his counsel had not given him access to some of the discovery evidence. The court noted that Peterson "had a number of different attorneys over the course of" his case. Peterson had six attorneys, two of whom withdrew based on changes in employment and three others who withdrew for unknown reasons following Peterson's attempts to discharge them.[2] The court denied Peterson's request, explaining that his trial had already been seriously delayed and that his counsel was competent.

Trial commenced on May 8, 2023. The State showed the jury two additional videos filmed on January 16 and 27, 2017, with accompanying audio. The audio accompanying the January 16 video included a conversation in which a female said, "I'm about to shoot the fuck out of him," and "Imma just drop kick him then. Imma just jump up there and kick him right in his face." Peterson did not object to the audio in these videos.[3] Additionally, Stangeland testified that the January 27 video was taken near the area where Pitts was shot. In the audio accompanying the January 27 video, Peterson can be heard saying, "[N]ow you

---

[2] The State filed a motion with this court to designate an additional document for review, an order dated January 3, 2020, ruling on various motions, including denying a motion to discharge counsel. As this document is already part of the appellate record, we deny the motion.

[3] While Peterson did raise other objections about the video, all of which the court overruled, none was about the substance of the video or the audio. For example, he objected to the records because "the Facebook witness . . . didn't identify these as the records that he sent or that Facebook sent." He also objected to Stangeland's statement that she recognized the individual in the video as Darryl Peterson as speculation. Finally, Peterson objected to a question to Stangeland about whether, in a video of the Porsche, she could see Peterson's reflection in the Porsche and what clothing he was wearing—specifically, whether she could see an article of clothing hanging below Peterson's jacket. Peterson objected to the State's characterization, "an article of clothing," as speculation.

gotta defuse some shit . . . some shit gotta be defused."

A jury convicted Peterson of murder in the first degree. In a bifurcated portion of the trial, the trial court found Peterson guilty of unlawful possession of a firearm in the first degree. The court imposed a sentence of 448 months of incarceration as well as the VPA.

## DISCUSSION

Peterson challenges the following on appeal: (1) the trial court's failure to adequately inquire into his request to discharge his counsel; (2) the trial court's decision to grant a continuance as a sanction for the State's disclosure of DNA test results obtained several years after his arrest; (3) the trial court's admission of video evidence showing Peterson holding a firearm; (4) the deprivation of his right to effective assistance of counsel for his counsel's failure to object to the admission of audio clips played at trial; (5) the cumulative effect of the aforementioned errors; and (6) the trial court's imposition of the VPA.

I.      Request to Discharge Counsel

On May 11, 2023, before the jury was empaneled, Peterson sought to obtain new counsel. He asked his counsel, "[w]hen are you going to tell [the court] I want new counsel," to which his counsel responded, "We'll do that when we're done with the jury panel." After the jury was empaneled, Peterson addressed the court and explained he wanted new counsel, as "[d]ue to lack of communication with my attorney, [] there's quite a bit of things that I have requested for him to do which wasn't done. And then there was some things that

were said that I really don't agree with." In response to Peterson's request, the court stated:

> [W]e are now in day three of trial, substantial resources have been committed towards getting to this point in the trial. I take notice from the Court records that you've had a number of different attorneys over the course of this case which has been pending since 2017. It's extraordinarily rare for a case to be delayed for trial this long.
>
> I also take judicial notice that [your counsel] is a very highly-qualified and skilled lawyer, both his [] credentials and through my observations of his [] briefings and his arguments and his engagement in jury selection. I believe you are very well represented here.

The court also told Peterson it was important that counsel and client have good communications, but the court could not discharge his attorney, and Peterson would "need to communicate clearly with [his counsel]." Peterson elaborated that he had come across an individual who was in the area when the "altercation" with Pitts occurred and who was willing to speak to Peterson's attorney, but despite Peterson's asking, his attorney did not contact the person. He also explained that the reason he had multiple attorneys was not because of him, but was related to changes in their employment and assignments. Finally, Peterson stated that "through all this time I've given them people to go talk to, a whole lot of things, and none of it was ever done," including that he had never seen the surveillance videos before they were played at the May 9 pretrial hearing. The court nonetheless denied his request to discharge counsel.

On appeal, courts review a denial of a request to discharge counsel for an abuse of discretion. State v. Varga, 151 Wn.2d 179, 200, 86 P.3d 139 (2004). A trial court abuses its discretion when its decision "is manifestly unreasonable, or

is exercised on untenable grounds, or for untenable reasons." State v. Blackwell, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993). The Sixth Amendment and article I, section 22 of the Washington Constitution guarantee a criminal defendant the right to assistance of counsel, but a criminal defendant "does not have an absolute, Sixth Amendment right to choose any particular advocate." State v. Stenson, 132 Wn.2d 668, 733, 940 P.2d 1239 (1997) (Stenson I). Nor does the Sixth Amendment provide any right to have a "meaningful relationship" with appointed counsel. State v. Holmes, 31 Wn. App. 2d 269, 279, 548 P.3d 570 (2024), rev. denied, 3 Wn.3d 1024, 556 P.3d 1111 (2024). Rather, "the right to effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial." United States v. Cronic, 466 U.S. 648, 658, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984). Thus, "the Sixth Amendment is not implicated absent an effect of the challenged conduct on the reliability of the trial process." State v. McCabe, 25 Wn. App. 2d 456, 461, 523 P.3d 271, rev. denied, 1 Wn.3d 1014 (2023).

A criminal defendant who is dissatisfied with their appointed counsel "must show good cause to warrant substitution of counsel." Stenson I, 132 Wn.2d at 734. Good cause exists when there is a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication. Id. These are separate concepts. Holmes, 31 Wn. App. 2d at 278. To determine whether to grant a motion to substitute counsel, a court must consider several factors, including "(1) the reasons given for the dissatisfaction, (2) the court's own evaluation of

counsel, and (3) the effect of any substitution upon the scheduled proceedings."
Stenson I, 132 Wn.2d at 734.

Here, Peterson asserts that his inability to review discovery before the
pretrial hearing constituted "an absolute breakdown in communication" that
required the trial court to conduct a more in-depth inquiry into his dissatisfaction
with his counsel. He argues that absent such inquiry, the court erroneously relied
on "factors largely beyond Peterson's control in denying" his request for
substitute counsel.

A trial court conducts an adequate inquiry into a defendant's request to
discharge counsel " 'by allowing the defendant and counsel to express their
concerns fully.' " Holmes, 31 Wn. App. 2d at 284 (quoting State v. Schaller, 143
Wn. App. 258, 271, 177 P.3d 1139 (2007)). When the defendant asserts their
reasons for dissatisfaction on the record, formal inquiry is not always necessary.
Schaller, 143 Wn. App. at 272.

To support his argument that the trial court's inquiry here was inadequate,
Peterson compares State v. Lopez, 79 Wn. App. 755, 764, 904 P.2d 1179
(1995). In Lopez, the defendant asked for substitute counsel, explaining that his
current counsel "isn't helping me at all," to which the court immediately
responded, "I'm not going to appoint you another attorney." Id. at 764. The Lopez
court explained that the heightened Sixth Amendment implications require courts
to "inquire carefully into the defendant's reasons for the distrust." Id. at 765. It
then held that the trial court abused its discretion in denying the defendant's

request because its decision was conclusory, it failed to evaluate the reasons the defendant was dissatisfied, and it failed to "inform itself of the facts." Id. at 767.

Here, unlike in Lopez, the trial court conducted an adequate inquiry into Peterson's request, as Peterson had the opportunity to fully discuss his reasons for being dissatisfied with his counsel. Peterson informed the court that he had not previously seen the surveillance footage[4] played at the pretrial hearing even though it had been available for several years and he had asked his counsel to see it.[5] Peterson also complained about general "lack of communication" and that "there was some things that were said that I really don't agree with." Even after the court ruled on the motion, it allowed Peterson to further explain his concerns, including that his attorney allegedly failed to follow up with a potential witness, that he was not the reason he had had multiple attorneys, and that none of his attorneys did what he asked, again mentioning that he had never seen the videos before they were played at the pretrial hearing.

We conclude that trial court conducted an adequate inquiry into Peterson's request to discharge counsel.[6] Next, we review whether the court's decision to

---

[4] Peterson's argument on this claim is limited to his counsel's failure to show him the surveillance videos prior to the hearing on motions in limine, not the other videos that are the basis for his ineffective assistance claim. By contrast, his separate claim that defense counsel's lack of preparedness and failure to object to the audio constituted ineffective assistance pertains to the Facebook videos from January 16 and 27.

[5] In explaining the basis for his request for new counsel, he stated, "Just like when we sat in here the other day and seen a couple of these videos; I've never seen those videos. I've been asking this for the longest [time] to see everything. And I've never seen none of these videos."

[6] Citing Cronic, 466 U.S. 648, Peterson argues that even if the trial court did conduct an adequate inquiry, this court should presume prejudice under the standard in Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). However, we presume prejudice only when there is a "complete denial of counsel." Cronic, 466 U.S. at 659. We must first determine whether the court erred by denying the request to discharge counsel before reaching the issue of any prejudice resulting from the denial.

deny Peterson's motion to discharge counsel was an abuse of discretion, applying the factors set out in Stenson I, 132 Wn.2d 668.

As to the first Stenson I factor, reasons for dissatisfaction, Peterson's complaints are largely about communication issues, such as his counsel's allegedly not following his direction and not sharing information. These disagreements are not the type of conflict that is so irreconcilable that it results in the denial of the right to counsel. An irreconcilable conflict exists when " ' the breakdown of the relationship results in the complete denial of counsel.' " Holmes, 31 Wn. App. 2d at 280 (quoting State v. Schaller, 143 Wn. App. at 268). "Attorney-client conflicts justify the grant of a substitution motion only when counsel and defendant are so at odds as to prevent presentation of an adequate defense." Stenson I, 132 Wn.2d at 734. However, a defendant cannot demonstrate irreconcilable conflict if they merely disagree with counsel over trial strategy or generally lose confidence or trust in their counsel. In re Pers. Restraint of Stenson, 142 Wn.2d 710, 726-30, 16 P.3d 1 (2001) (Stenson II).

For instance, in Stenson II, the court rejected a claim of irreconcilable conflict based on similar types of complaints as Peterson's. Stenson claimed his "attorneys refused to investigate things he and his family thought were important to the case," his attorney visited him insufficiently frequently, he "could never get through to [counsel] on the phone," and he continued to complain about a lack of communication. Stenson II, 142 Wn.2d at 727-29. Moreover, after the court denied Stenson's motion for new counsel, Stenson's *counsel* moved to withdraw, explaining he was "extremely frustrated with [Stenson] to the point of really not

11

wanting to go on with this case" and even stated that he "[couldn't] stand the sight of him." Id. at 729. Yet the court held this was not an irreconcilable conflict. Id. at 732. Similarly, here, Peterson's reasons for dissatisfaction, such as his counsel's not sharing information, not being sufficiently available, and not following his direction, do not establish irreconcilable conflict.

Peterson also analogizes to State v. Wicker, 105 Wn. App. 428, 432, 20 P.3d 1007 (2001), in which the court held defense counsel's omission constituted a denial of the defendant's right to counsel. Wicker is distinguishable. There, counsel failed to timely file a motion for revision of a juvenile court commissioner's ruling at a disposition hearing at which the defendant was found guilty of assault in the fourth degree. Id. at 430-31. The court reasoned that like a failure to file a notice of appeal, which is "well-recognized" to be "professionally unreasonable" and does not require an additional showing of prejudice, the failure to file a motion for revision was per se prejudicial because it involved a constitutional right. Id. at 431-32. By contrast, here, counsel's alleged failure to show Peterson surveillance videos is not the type of conduct that is "well-recognized" to be "professionally unreasonable" and does not involve a constitutional right, so it does not constitute a denial of the right to counsel.

Regarding the second Stenson I factor for assessing a motion to discharge counsel—the court's own evaluation of counsel—based on both the attorney's credentials and through the court's observations of his briefing, arguments, and jury selection, the court found that Peterson's current counsel was "a very highly-qualified and skilled lawyer." This evaluation suggests

12

circumstances that, as in <u>Stenson</u> II, "do not come close" to conflict leading to complete denial of the right to counsel. 142 Wn.2d at 732.[7]

Finally, as to the third <u>Stenson</u> I factor—the effect of any substitution upon the scheduled proceedings[8]—the trial court noted that it was the third day of trial, "substantial resources" had already been expended on his case, the length of pendency of Peterson's case was "extraordinarily rare," and any change of counsel would result in further delay.

The trial court conducted an adequate inquiry before denying Peterson's request to discharge counsel. Further, in addressing Peterson's request, the trial court considered the applicable factors, and its decision was neither manifestly unreasonable nor based on untenable grounds. Therefore, the court did not abuse its discretion in denying Peterson's motion to discharge counsel.

## II.      Remedy for Delayed Disclosure of DNA Analysis

Peterson argues that the trial court erred in deciding that a continuance was the appropriate remedy for the State's "untimely disclosure" of the STRmix DNA testing results that tied Peterson to DNA from shell casings gathered at the scene. Peterson claims the State had been aware of the STRmix software since late 2018, yet did not seek a DNA sample from Peterson to analyze using this technology until August 2022, shortly before trial was scheduled to begin on November 1. Peterson argues that the delay in STRmix DNA testing constituted

---

[7] We need not evaluate whether Peterson's counsel was ineffective pursuant to <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), to resolve Peterson's request to discharge counsel claim because we determine that the trial court did not err by denying his request to discharge counsel.

[8] This factor is similar to the timeliness of the motion, which is the third factor courts consider to determine whether an irreconcilable conflict results in the denial of a defendant's right to counsel. <u>Stenson</u> II, 142 Wn.2d at 724.

a significant discovery violation that required him to choose "between counsel who could adequately understand the new evidence and suffering a violation of his speedy trial rights," and that exclusion was the appropriate remedy, not a continuance.

At the August 15 pretrial hearing, Peterson expressed concern as to why the State was requesting new DNA testing, when he had already been in custody for 64 months. He stated that he did not know anything about "this new technology" and asked the court for time "to look up and [] to research and see how reliable this [new technology] is and how long [it] has been around." The court acknowledged that although the State had a valid basis for needing the buccal swab and Peterson's counsel did not have a legal basis for an objection, it would grant a continuance to permit him to confer with his counsel.

On September 6, because Peterson withheld consent, the court then authorized the use of reasonable force to obtain the DNA sample. The State used STRmix software to compare Peterson's buccal sample to DNA found on the shell casings recovered from the scene, which revealed that it was "19 septillion times more likely" that the DNA on the shell casings originated from Peterson.

On October 26, Peterson moved to suppress the DNA testing results, voicing concerns about the length of time between his arrest as well as the accuracy and reliability of the testing technology. He argued that DNA had not previously been an issue in the case, but the STRmix analysis changed "the complexity of what we were worried about" and required him to choose between

a speedy trial versus "having counsel prepared for trial." The court denied Peterson's motion to exclude the results[9] but held that a continuance would allow Peterson to appropriately prepare for trial and was an appropriate sanction for the State's delay in conducting the STRmix analysis and providing the results. Trial commenced on May 16, 2023.

On appeal, we review sanctions imposed for discovery violations for an abuse of discretion. State v. Barry, 184 Wn. App. 790, 797, 339 P.3d 200 (2014). When a party violates discovery deadlines, the court may grant a continuance or impose an order it "deems just under the circumstances," as a remedy. CrR 4.7(h)(7)(i). Courts have significant discretion to determine the appropriate remedy for an untimely discovery disclosure. State v. Farnsworth, 133 Wn. App. 1, 13, 130 P.3d 389 (2006). However, "[e]xclusion or suppression of evidence . . . for a discovery violation is an extraordinary remedy and should be applied narrowly." State v. Vance, 184 Wn. App. 902, 911, 339 P.3d 245 (2014); see, e.g., State v. Ruelas, 7 Wn. App. 2d 887, 896, 436 P.3d 362 (2019) (explaining that exclusion of witness testimony may be appropriate for discovery violations where any other sanction would have prejudiced the State).

Courts weigh the following four factors to determine whether to exclude evidence to remedy a discovery violation:

> (1) the effectiveness of less severe sanctions; (2) the impact of witness preclusion on the evidence at trial and the outcome of the case; (3) the extent to which the [party opposing admission of evidence] will be surprised or prejudiced by the [] testimony; and (4) whether the violation was willful or in bad faith.

---

[9] The court analyzed the issue under CrR 4.7, noting that although "styled as a 3.6 motion," it was really a "motion to exclude evidence pursuant to 4.7."

Ruelas, 7 Wn. App. 2d at 898 (quoting State v. Hutchinson, 135 Wn.2d 863, 883, 959 P.2d 1061 (1998), abrogated on other grounds by State v. Jackson, 195 Wn.2d 841, 467 P.3d 97 (2020)).

Here, the record shows that the trial court found it "incredible that the State was not aware of this technology and was not partnering more effectively with one of their key forensic investigators," and then considered the four factors to determine that a continuance was the proper remedy for the State's discovery violation.

As to the first factor, the effectiveness of less severe sanctions, the court found that a continuance would sufficiently permit Peterson to prepare for trial. Peterson argues that a continuance was not an effective remedy because the State's actions constituted a significant violation. But the record indicates that the continuance afforded Peterson seven additional months to investigate the STRmix analysis software. Also, once trial commenced, he was able to cross-examine the State's DNA analyst about the STRmix analysis process.

As to the second factor, the impact of exclusion on the outcome, the court found that the STRmix analysis "is a very crucial piece of evidence. . . . that directly links Mr. Peterson to the [] this particular ammunition." Peterson argues that the evidence could not have been outcome determinative, given that his case was being prosecuted and had been pending for years before the State discovered its availability. However, the State's DNA analyst testified that regarding the DNA on the shell casing, "it is 19 septillion times more likely to observe this DNA profile if it originated from Darryl Peterson and two unknown

contributors . . . ." The court held because that the STRmix analysis confirmed the presence of Peterson's DNA on the shell casing, it was "the only forensic evidence that the State would be relying on at trial" and, thus, was of "significant import to the State," so excluding it would have had a substantial impact on the State's case.

As to the third factor, surprise or prejudice,[10] Peterson contends that the State's untimely disclosure of the STRmix analysis results was "impermissibly prejudicial" because it compelled him to choose between his right to prepared counsel or a speedy trial. However, "dismissal [is not required] in every instance where untimely discovery by the State affects the defendant's ability to prepare the defense within the speedy trial period." State v. Smith, 67 Wn. App. 847, 853, 841 P.2d 65 (1992). While "[a] defendant may be impermissibly prejudiced if a late disclosure compels him to choose between his right to a speedy trial and his right to be represented by adequately prepared counsel," the defendant "must articulate how the late disclosure materially prejudiced his defense." State v. Salgado-Mendoza, 189 Wn.2d 420, 436, 403 P.3d 45 (2017) (analyzing prejudice to right to counsel under CrR 8.3 motion to dismiss). Here, Peterson does not explain how the continuance materially prejudiced his defense. Rather, the court noted that a continuance allowed him "a full opportunity to prepare for trial." The court also noted that while it was "extremely unhappy" to further continue the

---

[10] The third factor is not limited to surprise or prejudice to the prosecution, but applies to any party opposing the admission of evidence. See also State v. Salgado-Mendoza, 194 Wn. App. 234, 250, 373 P.3d 357 (2016), rev'd on other grounds, 189 Wn.2d 420, 403 P.3d 45 (2017).

17

case, granting another continuance "doesn't cause this case to be five years old," but rather "pile[d] on" to the pre-existing delays.

As to the fourth factor, the court explicitly stated that while "the violation here was alarming," it did not find that it was willful or in bad faith. Peterson asserts that the State failed to exercise due diligence to use the STRmix technology because it had been available for several years while his case was pending, but he does not specifically challenge the court's finding on this factor. And the record shows that when the State initially tested Peterson's DNA around the time of his arrest, because the results were inconclusive, it did not follow up with the lab about other possible DNA matches or testing and instead focused on other evidence. As a result, the State explained that it was not on notice to look for an update in technology that could render a more conclusive DNA analysis until it formulated its witness list in preparation for trial.

The record shows that the court properly considered the relevant factors to determine whether to exclude the STRmix analysis as a discovery sanction. The continuance afforded Peterson an additional seven months to learn about the STRmix technology, obtain an expert, and otherwise prepare to challenge the DNA evidence at trial. We hold that the trial court did not abuse its discretion by determining that a continuance would alleviate any prejudice caused by the State's belated testing of DNA using the STRmix technology.

III.    Admission of January 1 and 18 Videos without Audio

Peterson claims that the trial court violated his right to a fair trial by admitting two videos from January 1 and 18 that show him holding what

appeared to be a firearm. Specifically, he asserts that he is entitled to a new trial because the court's improper admission of the videos was prejudicial.

The right to a fair trial is a fundamental liberty guaranteed to all criminal defendants. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; Estelle v. Williams, 425 U.S. 501, 503, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976). The rules of evidence "shall be construed to secure fairness in administration . . . to the end that the truth may be ascertained and proceedings justly determined." ER 102. In line with this purpose, relevant evidence is generally admissible. ER 402. Evidence is relevant when it tends "to make the existence of any fact . . . more probable or less probable than it would be without the evidence." ER 401. However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." ER 403. A court has broad discretion to "balance relevance against prejudice." State v. Baldwin, 109 Wn. App. 516, 528, 37 P.3d 1220 (2001). Further, "evidence that is likely to arouse an emotional response" from the jury is unfairly prejudicial. State v. Rice, 48 Wn. App. 7, 13, 737 P.2d 726 (1987). On appeal, we review a trial court's weighing of the probative value of evidence against the prejudicial effect for an abuse of discretion. In re Det. of Halgren, 156 Wn.2d 795, 802, 132 P.3d 714 (2006).

First, we conclude that the January 1 and 18 videos were relevant. As the parties acknowledge, a social media photograph or video can be relevant to establish a person's identity. See, e.g., United States v. Wright, 993 F.3d 1054, 1062-63 (8th Cir. 2021) (admission of a photograph from the defendant's

Facebook page of a man with tattoos wearing a mask and holding cash was relevant to identifying the defendant). Moreover, here, the Facebook videos were relevant as impeachment evidence. Peterson had stated to detectives that he had not possessed firearms since 2007, but the videos demonstrated Peterson's access to firearms around the time of the shooting and that he possessed a firearm similar to the one used to kill Pitts. Thus, the videos impeached Peterson's credibility and, as such, are probative of Peterson's involvement in Pitts's death. Compare United States v. Garcia, 729 F.3d 1171, 1179 (9th Cir. 2013) (where witness testified that the victim never possessed firearms, defendant should have been permitted to introduce photographs that impeached witness's credibility).

Further, we conclude the court did not abuse its discretion in determining that the probative value of the January 1 and 18 videos outweighed any prejudicial impact. Peterson argues that the videos were unfairly prejudicial because it was difficult to discern whether the firearm in the video was real or was the one used to shoot Pitts. But video evidence need not be excluded merely because it is difficult to discern what the object is. See, e.g., State v. Fedorov, 183 Wn. App. 736, 743, 335 P.3d 971 (2014) (video showing officers removing objects from the defendant's pocket was not irrelevant or unfairly prejudicial where it was impossible to identify the objects as pocket knives). Peterson further argues the videos suggested that he was the type of person "that kills people" and were likely to "arouse an emotional response" from the

jury[11] and that the court failed to give a limiting instruction explaining how the jury was to interpret the evidence of him holding a firearm. But Peterson did not request such an instruction. The court appropriately mitigated any prejudicial impact of the video by granting Peterson's motion to exclude the audio. Therefore, we hold that the trial court did not abuse its discretion in admitting the January 1 and 18 videos of Peterson holding a firearm, without the audio.

IV.     Ineffective Assistance of Counsel

Peterson argues that his trial counsel was constitutionally ineffective for failing to object to "unfairly prejudicial" audio that accompanied the January 16 and 27 Facebook videos the State played for the jury. We disagree.

A criminal defendant has a constitutional right to effective counsel. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. A defendant's counsel is ineffective when (1) counsel's conduct falls below the objective standard of care and (2) counsel's deficient conduct prejudiced the outcome. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). A defendant must satisfy both prongs of the Strickland test to prevail. State v. Jeffries, 105 Wn.2d 398, 418, 717 P.2d 722 (1986). "Courts engage in a strong presumption counsel's representation was effective." State v. McFarland, 127 Wn.2d 322,

---

[11] Peterson also cites to ER 404(b), but as the State points out, he does not engage in any explicit 404(b) analysis. While evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith, it may be admissible for other purposes, such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." ER 404(b). ER 404(b) requires a two-part analysis: (1) the evidence sought to be admitted must be relevant to a material issue and (2) the evidence's probative value must outweigh its potential for prejudice. State v. Lane, 125 Wn.2d 825, 831, 889 P.2d 929 (1995). Peterson focuses only on the second part of the ER 404(b) test, and his argument consists of only the conclusory suggestion that there was a significant risk that the jury would interpret the video as evidence of his propensity for violence.

335, 899 P.2d 1251 (1995). Courts are not required to consider both deficiency and prejudice if a petitioner fails to prove one prong. In re Pers. Restraint of Crace, 174 Wn.2d 835, 847, 280 P.3d 1102 (2012). We review a claim of ineffective assistance of counsel claim de novo. State v. Backemeyer, 5 Wn. App. 2d 841, 848, 428 P.3d 366 (2018).

To satisfy the deficiency prong, the defendant must show that counsel's representation fell below an objective standard of reasonableness in light of all the circumstances. Strickland, 466 U.S. at 688. Conduct that constitutes legitimate trial strategy cannot be deficient conduct. State v. Hendrickson, 129 Wn.2d 61, 77-78, 917 P.2d 563 (1996). However, "[n]ot all strategies or tactics on the part of defense counsel are immune from attack." State v. Grier, 171 Wn.2d 17, 33-34, 246 P.3d 1260 (2011).

Here, the State sought to admit the January 16 and 27 videos to establish Peterson's identity as the person on the surveillance videos and his familiarity with the area where Pitts was shot. In the audio for the January 16 video, a male speaker is heard saying, "go get her ass," and "[a]ll you gotta do is get a hold of her," and a female speaker can be heard saying, "I'm about to shoot the fuck out of him," and "Imma just drop kick him then. Imma just jump up there and kick him right in his face." Peterson asserts that counsel's failure to object was not a legitimate trial strategy and was particularly egregious given that he had "strenuously [objected] during motions in limine to other less concerning audio,"

but then failed to object to audio of Peterson engaging in a discussion "about shooting a person."[12]

The State makes a strained argument that the audio supported Peterson's defense theory, contending that in the January 27 video, Peterson does not appear to get involved in the interaction and appears calm, so counsel could have had a strategic reason not to object to the audio. But the audio, unlike the video, provided no probative value. At trial, Peterson did not rely on the January 16 video to suggest that one of the speakers, particularly the female who said "I'm about to shoot the fuck out of him," was Pitts's shooter. To the contrary, there was no obvious strategic purpose for failing to object to the audio as prejudicial, because the conversation could be interpreted to indicate planning for violence. Indeed, had Peterson objected that the audio was unduly prejudicial, it was at least possible that the court would have excluded it, given that the court had granted his previous request to exclude the audio from other videos on similar grounds.

Even if Peterson's trial counsel was deficient for failing to object to the audio portion of the January 16 and 27 videos, we conclude that Peterson cannot establish prejudice. A criminal defendant can show prejudice when there is a "reasonable probability" that the outcome would have been different barring

---

[12] He further argues that his counsel's failure to object may have been caused by counsel's lack of preparedness. He claims the fact that his counsel stated at a pretrial hearing, "I want to take a look at the fricken videos," shows that his counsel had not viewed the videos. However, Peterson does not make a separate claim of deficient performance based on counsel's failure to watch the videos. Moreover, he cites only to an offhand statement after the May 11 pretrial hearing had concluded that appears to have been inadvertently captured in the transcript without the full context. Neither the statement nor anything else in the record establishes that counsel did not watch the videos either before the hearing or between the hearing and trial.

counsel's deficient performance. State v. Bertrand, 3 Wn.3d 116, 124, 546 P.3d 1020 (2024). This requires more than a " 'conceivable effect on the outcome.' " State v. Estes, 188 Wn.2d 450, 458, 395 P.3d 1045 (2017). Peterson cites to Estes, 188 Wn.2d at 466, in which defense counsel's performance was held to be prejudicial because there was a reasonable probability that had counsel informed his client of the implications of the plea, the outcome would have been different. There, defense counsel "was unable to communicate crucial information to his client" because he failed to research the impacts that a deadly weapon enhancement would have on the defendant's available pleading options. Id.

Here, Peterson cannot show that there was a reasonable probability that his counsel's failure to object to the audio would have changed the outcome of the trial. As noted above, the audio had little to no probative value, and the State did not rely on it in its closing,[13] much less use the audio in a prejudicial manner. There was ample other evidence to support Peterson's conviction, including his DNA on the shell casings found at the scene and the surveillance footage showing his vehicles at the scene. Additionally, evidence obtained from a search of Peterson's phone showed that he made incriminating internet searches inquiring how to "remov[e] gunpowder residue" from a person's clothing and skin and for any "breaking news" in Seattle.

---

[13] During closing, the State referenced these videos only twice, without reference to the audio. The State noted that the videos were from "within less than 24 hours of the murder where he's showing himself in the area of the murder wearing the same clothing he's wearing during the murder," and later, referenced them as evidence of Peterson's apparel and his proximity to the location of the shooting.

We hold that Peterson cannot overcome the weighty presumption that trial counsel provided constitutionally effective assistance. Even if his counsel's failure to object to the audio from the January 27 videos was deficient, it was not prejudicial.

V.     Cumulative Error

Peterson contends that if the claimed errors individually do not require reversal, the cumulative impact of the errors denied him a fair trial and warrant reversal. A defendant is entitled to a new trial under the cumulative error doctrine when the "cumulative errors produce a trial that is fundamentally unfair." State v. Emery, 174 Wn.2d 741,766, 278 P.3d 653 (2012). For example, Peterson cites State v. Coe, in which the court held that cumulative errors required a new trial. 101 Wn.2d 772, 789, 684 P.2d 668 (1984). The errors in Coe included that (1) the jury instruction conflated the "reasonable doubt" standard by stating it need be "substantial"; (2) the trial court admitted testimony of witnesses who had been hypnotized without conducting the appropriate analysis; (3) where the prejudicial impact of the defendant repeating the words of the perpetrator was substantially outweighed by its probative value; (4) the cross examination of the defendant about articles he had written was irrelevant and unduly prejudicial; (5) when the court admitted testimony of a witness that placed the defendant "on trial for a crime with which he was never charged;" (6) when the trial court admitted testimony of the defendant's former girlfriend to attempt to establish identity; (7) and when the trial court allowed cross examination of the defendant about an unrelated charge of shoplifting as impeachment. 101 Wn.2d at 774.

By contrast, in <u>Emery</u>, the court held that there was not cumulative error that warranted reversal. 174 Wn.2d at 765-66. In <u>Emery</u>, the defendant alleged a multitude of errors including (1) prosecutorial misconduct, (2) the trial court's improper denial of his codefendant's motion to sever, (3) ineffective assistance counsel cumulatively entitled him to a new trial. <u>Id.</u> at 766. The <u>Emery</u> court concluded that only one of the defendant's claims—prosecutorial misconduct— constituted error because the prosecutor improperly implied that the "jury must be able to articulate its reasonable doubt by filing in the blank" and that the jury's task was to find the truth. <u>Id.</u> at 760. However, the defendant could not prove prejudice because he failed to object at trial and the errors could have been cured by instructions. <u>Id.</u> at 762-64.

Here, Peterson has failed to show a cumulative impact of trial errors. Unlike <u>Coe</u>, 101 Wn.2d 775-87, where the court found nearly every error to be prejudicial to the defendant, here, as in <u>Emery</u>, 174 Wn.2d at 759-66, there is only one error that did not result in prejudice, deficient performance by counsel in failing to object to the audio portion of the Facebook videos. We hold that Peterson is not entitled to a new trial under the cumulative error doctrine.

VI.     VPA

Peterson asserts that we should strike the VPA because he is indigent, and, pursuant to legislative amendments that apply to cases pending on direct appeal, courts cannot impose the VPA on indigent defendants. The State does not dispute that Peterson is indigent[14] or that we should strike the VPA.

---

[14] The trial court issued an order of indigency for Peterson.

Accordingly, we remand to strike the VPA from Peterson's sentence.

CONCLUSION

We affirm Peterson's conviction but remand to strike the VPA from his sentence.

_Chung, J._

WE CONCUR:

_____, ACJ    _____